STATE of Tennessee, Appellee,

v.

James D. SENSING, Appellant.

Supreme Court of Tennessee,
at Nashville.

Nov. 23, 1992.

Niles S. Nimmo, Nashville, for appellant.

Charles W. Burson, Atty. Gen. & Reporter, Kimbra R. Spann, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

O'BRIEN, Judge.

James D. Sensing was indicted, tried and convicted of driving under the influence of an intoxicant, second offense, on 2 October 1988. He was fined $500 and sentenced to jail for 11 months and 29 days. All but 35 days was suspended with the remainder of the sentence to be served on probation.

Defendant appealed, contending that the trial court erred in allowing into evidence the results of an Intoximeter 3000 breathalyzer test. He also contested the sufficiency of the evidence. The Court of Criminal Appeals found these issues to be without merit.

An appeal was taken to this Court. The application was granted for the singular purpose of reconsidering the judgment of this Court in *Pruitt v. State*, 216 Tenn. 686, 393 S.W.2d 747 (1965). We are of the opinion that too much significance has been attached to that decision. In the entire 27 years since *Pruitt* was decided the case has been cited only eight (8) times. Among those cases we consider three (3) to be on point with the issues involved here. Four (4) of the cited cases were affirmed, four (4) were reversed. Two (2) of the cases cited came from the same jurisdiction as the one before us. Both were affirmed. Only one (1) of these was decided on the same issues.

We cannot discuss the pertinent issues decided in *Pruitt* without considering *Fortune v. State*, 197 Tenn. 691, 277 S.W.2d 381 (1955), which was cited in *Pruitt* as authority for the requirement that in the administration of breathalyzer testing, "Whatever the device used, qualified experts must operate the machine, and they, or someone else qualified, must interpret these test results in evidence before a trial court." At the time of the advent of *Fortune*, in 1955, the Court found that the machine or test used for [proving intoxication] was not so generally known or so "notorious" nor was the operation of the device "a practical application of scientific facts which are generally known or ought to be known," and so they were not the subject of judicial notice. Therefore, for these scientific test results to be introduced as evidence this evidence must come through professional experts to interpret the test results and in admitting expert testimony the court must see that the expert had some special as well as practical knowledge of the subject upon which he was to testify. It was held that a policeman or technician, who had training and experience in testing for alcohol in body fluids or breath, may properly qualify as an expert witness but competent proof should be offered that the device used to make the test was a proper one and in good and accurate order at the time it was used.

Ten years later in *Pruitt*, the Court found that a device known as the Borkenstein Breathalyzer, designed and developed in 1954, was considered a reliable device for measuring intoxication. It was held that "[t]he State is required to show that the measuring device is scientifically acceptable and accurate for the purpose for which it is used, and that the witness who presents the test results is qualified to interpret them." Citing *Fortune*, it was held that the failure of the State to qualify a witness as an expert on the operation and results of an intoxication test with scienti-

fic devices was reversible error. The Court noted in *dictum* that there is a practical limitation on the facilities of police administration to provide trained toxicologists or pathologists with extensive educational backgrounds. Such training is not required and an expert in the general broad field of chemical tests is not a necessity. We said it is not beyond practical limits, however, to provide expert technicians with an understanding of the theoretical and operative functions of a single device for testing intoxication. He must at least be able to understand why a breath test can be translated into a certain percentage of alcohol in the blood, 393 S.W.2d at 752. In that regard, *Pruitt* was cited in *Griffin v. State*, 578 S.W.2d 654, 658 (Tenn.Cr.App. 1978), cert. den'd 5 March 1979, as follows:

" ... The appellants cite *Pruitt v. State*, 216 Tenn. 686, 393 S.W.2d 747 (1965); *Fortune v. State*, 197 Tenn. 691, 277 S.W.2d 381 (1955).... The record does not support the allegations in this assignment. The operator of the machine had received special training on its operation and testing. He had approximately two years' experience in using the machine. The machine is serviced every three months. The witness testified that the machine was tested before each use to determine whether it was functioning properly. The evidence was admissible under the *Fortune* and *Pruitt* criteria...."

Since *Pruitt*, in 1965, there has been a vast advancement in scientific technology relative to blood alcohol testing as well as technical training in the operation of breath testing devices utilized for the detection of the blood alcohol level of persons suspected of intoxication. Prior to 1979 the development of the use of scientific instruments to determine the blood alcohol content of individuals by breath analysis was accomplished in this State under the auspices of the Governor's Highway Safety Office in cooperation with the State Medical Examiner and the Federal Government's National Highway Traffic Safety Administration, (NHTSA). In 1979 the director of the Governor's Highway Safety Office transferred those instruments then in use and the administration of the program to the forensic services division (crime laboratory) of the Tennessee Bureau of Investigation.

The National Highway Traffic Safety Administration has established requirements for instruments that measure the alcohol content of deep lung breath samples with sufficient accuracy for evidential purposes (evidential breath testers) based on model specifications to meet the standards for the purchase of such devices through the use of federal grant funds. Each such instrument submitted by a manufacturer is subjected to exacting tests conducted by the Department of Transportation (DOT) Transportation Systems Center. State and local governments may either rely on NHTSA test results and adopt the model specifications, or set their own requirements. Instruments meeting the model specifications are placed on a conforming products list. Tennessee has adopted the NHTSA model specifications, effective 1 July 1985, as the standard of the Tennessee Bureau of Investigation for approval of instruments and devices for breath alcohol testing of persons in conjunction with the offense of driving a motor vehicle while under the influence of intoxicants.[1] The procedure is now governed by statute in Tennessee. T.C.A. § 38–6–103 now provides, inter alia, as follows:

(d)(2) Upon approval of the director of the Tennessee bureau of investigation, local governing bodies which have the responsibility for providing funding for sheriffs' offices and police departments, are authorized to purchase from state contracts approved for bureau purchases, scientific instruments designed to examine a person's breath and measure the alcohol content thereof, for use as evidence in the trial of cases; provided, that prior to use thereof, such instruments must be delivered to the forensic services division of the bureau for testing and certification pursuant to subsection (g).

---

1. Shelby and Metro Davidson Counties each operate a program separate from the procedure provided by the Forensic Services Division of the TBI.

The bureau shall continue to maintain and certify the instruments and operating personnel, pursuant to subsection (g), and furnish expert testimony in support of the use of such instruments when required.

(g) The bureau, through its forensic services division, shall establish, authorize, approve and certify techniques, methods, procedures and instruments for the scientific examination and analysis of evidence, including blood, urine, breath or other bodily substances, and teach and certify qualifying personnel in the operation of such instruments to meet the requirements of the law for the admissibility of evidence. When examinations, tests and analyses have been performed in compliance with such standards and procedures, the results shall be prima facie admissible into evidence in any judicial or quasi-judicial proceeding, subject to the rules of evidence as administered by the courts.

The Intoximeter 3000, the present breath testing device in general use in the State of Tennessee, is supplied to the various law enforcement agencies within the State through the Tennessee Bureau of Investigation. It is a computerized instrument which has been thoroughly tested by the forensic services division of the TBI in accordance with the NHTSA standards and is required to measure the alcohol content of vapor mixtures with a systematic error of no more than plus or minus five percent (5%) or 0.005% w/v, which ever is greater. Each law enforcement agency authorized to purchase a breath alcohol testing instrument in accordance with the provisions of T.C.A. § 38-6-103 must first have the instrument delivered by the manufacturer to the forensic service division for testing and certification prior to use. The agency must comply with strict requirements in reference to installation of the instrument, including appropriate facilities to interface by telephone modem to a computer located in the TBI forensic services laboratory. The operation of the instrument is limited to personnel certified by the forensic services division. The certification includes instruction and training of agency personnel to conduct breath alcohol tests on the instrument in question. The certification includes the procedures for testing a person to determine his blood alcohol level as well as the primary steps in the operation and basic theory of the instrument. It further includes the principal of determining the blood alcohol level of an individual by having them perform a breath test. The designated personnel are taught that a definite ratio exists between alcohol in the blood and alcohol in the deep lung breath which is 2100/1, and means that there is the same amount of alcohol in one (1) part of blood as there is in 2100 parts of deep lung air.[2]

■ The forensic services division inspects, repairs and maintains all units previously certified, including use of a laboratory computer controller to poll each instrument and correlate all test data of each instrument for clarification of instrument performance. Every 90 days forensic services division personnel conduct tests of each instrument under laboratory control conditions and record the results, noting any required adjustments or repairs of each unit. The certification also provides that upon request of the court, district attorney, defendant, or other person or party having an interest in the use of the test performed on an approved breath testing

---

**2.** Blood alcohol concentration (BAC) is expressed in percent weight by volume (%w/v) based upon grams of alcohol per 100 cubic centimeters of blood or per 210 liters of breath. A BAC of 0.10% w/v means 0.10 grams of alcohol per 100 cubic centimeters of blood (0.01g/100cc) or 0.10 grams of alcohol per 210 liters of breath. Alcohol concentrations in either breath or in air mixtures can also be expressed in milligrams of alcohol per liter of air (mg/l); to convert mg/l to units of percent weight by volume, multiply by 0.21. (Traffic Laws Anno., Sec. 11-002.1(a) (Supp.1983). The conversion factor of 0.21 is a commonly used value recognized by the Committee on Alcohol and Other Drugs of the National Safety Council; that is 210 liters of deep lung air at 34°C contains approximately the same quantity (mass) of ethanol [alcohol] as 100cc of pulmonary blood. See R.N. Harger, R.B. Forney and R.S. Baker. "Estimates of the Level of Blood Alcohol from Analysis of Breath." Quarterly Journal of Studies on Alcohol. 1-18 (1956).

instrument an official copy of those standards and procedures will be certified pursuant to T.C.A. § 38–6–107 and delivered to the requesting party. We are of the opinion that this procedure to supply records also conforms with the provisions of Tennessee Rule of Evidence, 803(8) as an exception to the hearsay evidence rule.

The fundamental question is the present foundation to be laid for the admission of evidentiary breath tester results. These instruments and procedures have become familiar and their use is now commonplace. Reliability has been demonstrated and the results of such testing where properly performed are generally accepted. We conclude that there may now appropriately be some relaxation of the rigorous prerequisites formerly required to authenticate the reliability of the scientific equipment and procedure when they were first employed. *See People v. Gower,* 42 N.Y.2d 117, 397 N.Y.S.2d 368, 366 N.E.2d 69 (1977).

■ We hold that it is no longer necessary for a certified operator of an evidentiary breath testing instrument to know the scientific technology involved in the function of the machine. There is a constant ratio between the amount of alcohol in the blood flowing through the lungs and the amount of alcohol in the deep lung breath. That ratio is 1:2100. *Pruitt, supra.* Modern scientific technology has facilitated the manufacture of computerized devices which accomplish the conversion of this ratio to a visual reading with nearly infallible accuracy. These machines are subjected to exhaustive testings to assure they meet required standards before use. Constant monitoring verifies their continued effectiveness. Generally, the average law enforcement officer does not have the technical background to qualify as an expert on the principal behind the conversion of breath alcohol content to blood alcohol content or the manner in which the instrument performs this function. Expert testimony and the records of such procedures are available for examination. The trial court is in a position to control the introduction of such evidence in order to avoid delay in the disposition of cases of this nature. We

hold that the testing officer must be able to testify (1) that the tests were performed in accordance with the standards and operating procedure promulgated by the forensic services division of the Tennessee Bureau of Investigation, (2) that he was properly certified in accordance with those standards, (3) that the evidentiary breath testing instrument used was certified by the forensic services division, was tested regularly for accuracy and was working properly when the breath test was performed, (4) that the motorist was observed for the requisite 20 minutes prior to the test, and during this period, he did not have foreign matter in his mouth, did not consume any alcoholic beverage, smoke, or regurgitate, (5) evidence that he followed the prescribed operational procedure, (6) identify the printout record offered in evidence as the result of the test given to the person tested.

■ The breath test result merely creates a rebuttable presumption of intoxication. T.C.A. § 55–10–408(b). The State must establish the competency of the operator, the proper operation of the machine and that the testing procedures are properly followed. The defense is then free to rebut the State's evidence by calling witnesses to challenge the accuracy of the particular machine, the qualifications of the operator, and the degree to which established testing procedures were followed. T.C.A. § 55–10–410(e) provides a person tested with the opportunity to have an independent blood test performed as a statutory right.

■ As the Court of Criminal Appeals noted in *State v. Johnson,* 717 S.W.2d 298, 305 (Tenn.Cr.App.1986), the connection between the test results and the factual issues in cases of this nature is obvious. However, it is a rare case in which the *only* evidence introduced to establish that a suspected offender is under the influence is either a breath or a blood test. In most cases there is the testimony of the arresting officer and others at the scene concerning the arrestee's driving pattern and their observations of the individual, including his speech, breath and eyes. Often a field sobriety test has been administered. Scien-

tific tests are corroborative evidence and may serve to exonerate as well as to convict an accused in a close case. Indeed the purpose of all the testing is to provide objective scientific data to eliminate guesswork and speculation and to supplement the fallible observations of humans. *Peterson v. State*, 261 N.W.2d 405, 409 (S.D. 1977).

We caution both court and counsel that the United States Supreme Court, as well as this Court, has held that the due process clause of the Fourteenth Amendment protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. This principle prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of the crime. *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 1970, 85 L.Ed.2d 344 (1985); *State v. Baker*, 729 S.W.2d 286, 287 (Tenn.Cr.App.1987). In *State v. Martin*, 702 S.W.2d 560 (Tenn.1985), this Court, citing from its previous ruling in *State v. Bolin*, 678 S.W.2d 40, 44–45 (Tenn.1984), reiterated, "that trial judges should avoid the use of the term 'presumption' in instructing juries in criminal cases except for the presumption of innocence. In its place juries may be instructed that a permissible inference may or may not be drawn of an elemental fact from proof by the State of a basic fact, but that such an inference places no burden of proof of any kind upon a defendant."

Having reached the conclusion that the technique of testing breath samples for blood alcohol content has achieved general acceptance in the scientific community, we have thus answered appellant's first query in reference to updating the criteria set out in *Pruitt, supra.*

Next, he asks if the results of the breath alcohol test to which he was subjected was improperly admitted into evidence? Preliminarily we observe that the arresting officer administered three (3) field sobriety tests which he referred to as a walking turn, a one (1) leg stand, and the horizontal gaze nystagmus test, all of which the appellant failed. In reference to the breath testing device and test which was administered, his testimony was that the machine was an Intoximeter 3000 which he had been trained to operate. He had received two (2) hours of classroom training and also hands-on instructions in the classroom approximately eight (8) months preceding the time of appellant's arrest. In the year prior to trial on 5 February 1990, he had administered approximately 30 tests on the machine. We do not consider this fact particularly relevant since the date of defendant's arrest was 2 October 1988. Nonetheless, he testified that he complied with the forensic services instruction and certification procedures. He had observed Mr. Sensing for the prescribed 20 minutes prior to administering the test to make sure he did not smoke, get sick, hiccup, belch or have any drink of any type of alcoholic beverage within that period. He had been utilizing the machine when occasion demanded for the previous two and one-half years. In reference to the operation of the machine, he testified that when it is turned on the machine clears itself of foreign objects or material inside. The operator is required to type in the operator's name, the subject's name, time arrested, the nature of the offense and various other incidental information including the arresting agency's code number. All of the foregoing are preliminaries to the administration of the test to make certain the machine is operating properly. If the machine is not operating properly the test is not given and its function must be corrected by a code procedure through the computer located in the crime laboratory. He began the administration of the test by having Mr. Sensing blow his breath into the machine. He endeavored to explain in court how the machine analyzed the breath alcohol in subject's system. His explanation was rather inarticulate. He endeavored to explain Henry's theory with small success but did relate that the ratio of the amount of alcohol in the blood to the amount of alcohol in the air section of the lungs was based on the same theory and was calculated by the

breath testing device. He could not explain how that calculation was accomplished.

■ Under the standards we have promulgated today the admissible evidence must show (1) that an evidentiary breath tester test was performed substantially in accordance with instructions approved by the forensic services division, with a type of device certified by the forensic service division, by a person trained and certified to conduct it and, (2) that the machine itself had been tested, inspected and certified in accordance with forensic division regulations to assure its accuracy before the results of an evidentiary breath tester test may be introduced. We take the view that the evidence in this case met those requirements and the results of the test were properly admitted. This is not to say that test results are infallible or conclusive. *See* J. Strong, McCormick on Evidence, Sec. 205 (4th Ed.1992). The breath test result merely creates a rebuttable presumption that a defendant is under the influence of an intoxicant to the extent that his or her ability to drive is impaired. T.C.A. § 55–10–408(b). A defendant is free to rebut the State's evidence by the introduction of any relevant evidence admissible under the Tennessee Rules of Evidence.

The judgment of the trial court is affirmed. The costs are assessed against the defendant.

REID, C.J., and DROWOTA, DAUGHTREY and ANDERSON, JJ., concur.