# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
March 2000 Session

## STATE OF TENNESSEE v. KIMBERLY M. LARSON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-T-937     Seth Norman, Judge**

---

**No. M1999-00507-CCA-R3-CD - Filed August 4, 2000**

---

This appeal arises from a guilty verdict returned against the defendant for DUI per se for which she received a sentence of eleven months and twenty-nine days, with all but ten days suspended, a $350 fine, court-ordered rehabilitation, and suspension of driving privileges for one year. On appeal, the defendant challenges the admittance of her breathalyzer test results at trial and alleges that her sentence was excessive. After a review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY, J., and WILLIAM B. ACREE, JR., SP.J., joined.

V. Michael Fox, Nashville, Tennessee, for the appellant, Kimberly M. Larson.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Edward S. Ryan, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On June 10, 1998, the defendant, Kimberly Larson, was found guilty by a Davidson County jury of driving under the influence per se. She was subsequently sentenced to eleven months and twenty-nine days incarceration, all except ten days suspended, ordered to participate in a rehabilitation program, and prohibited from driving for one year. The defendant then filed a motion for a new trial or acquittal, which was denied by the trial court on April 30, 1999. She has appealed to this court on two issues: (1) whether the trial court erred in denying the motion for acquittal or new trial based upon the improper admittance of scientific evidence; and (2) whether the trial court imposed an excessive sentence. Upon our *de novo* review of the record, we affirm the judgment of the trial court.

## FACTS

The only witness to testify in this case was Officer Harold R. Taylor, a ten-year veteran of the Metropolitan Police Department. At the time of the defendant's arrest, Officer Taylor was assigned to the Breath Alcohol Testing ("BAT") Division of the Traffic Enforcement Unit. He testified that, on the night of April 10, 1997, he was performing a routine patrol of West End Avenue. Just past midnight, Officer Taylor observed the defendant's vehicle traveling toward him at what appeared to be a speed greater than the posted speed limit. Using a radar unit, he was able to determine that the defendant's car was going fifty miles per hour in a thirty miles per hour zone. The officer activated his lights and sirens and pulled in behind the defendant's car, but the defendant traveled another six blocks before a second patrolman forced the vehicle to stop by using a public address system to order the defendant to pull over. Officer Taylor approached the defendant's car, got her driver's license, and asked her to exit the vehicle, because she had refused to stop for him. The officer testified that the defendant appeared intoxicated as she got out of her car. He stated that her eyes were red, her face was flushed, and he detected the odor of alcohol. Although her speech was not slurred, Officer Taylor noticed that her mouth was dry, and she kept licking her lips to keep her mouth wet. When asked, the defendant initially denied having consumed any alcohol, but the officer noticed unsteadiness when she walked.

After obtaining the defendant's consent to perform a field sobriety test, the officer instructed and demonstrated for the defendant the various maneuvers he asked her to perform.[1] He stated that she did "okay" on the "one-leg stand"[2] until she reached somewhere between eleven and twenty seconds. At that point, the defendant raised her arms to maintain her balance. Somewhere between twenty-one to thirty seconds, the defendant swayed somewhat and kept her arms away from her body to keep her balance. She counted incorrectly in the process of reaching thirty seconds and did not follow the officer's instructions, which indicated to the officer that she was somewhat confused. When Officer Taylor had her perform the "walk and turn" task,[3] the defendant was unable to maintain her balance. Instead of walking the first nine steps and then doing a two-step pivot, the defendant went twelve steps. She raised her arms and missed a couple of heel-to-toe steps. After the "two-step pivot," the defendant then went ten steps instead of nine and raised her arms again to maintain her balance. Based on cues he observed during the defendant's performance on the field

---

[1] According to the Intoxilyzer Alcohol Analyzer results attached to the Form #132 filled out by Officer Taylor, the breath alcohol test was administered at 1:02 a.m.

[2] Officer Taylor explained that this test requires subjects to stand on whichever leg they choose, hold the other leg approximately six inches off the ground while keeping the hands down to the sides, and count "one thousand one, one thousand two . . . etc." up to "one thousand thirty." This test is administered according to National Highway Traffic Safety Administration (NHTSA). standards. See infra note 7.

[3] This test requires the subject to stand on a line with one foot in front of the other one, heel-to-toe, and walk nine steps with the heel touching the toe of the other foot. At the end of the ninth step, the subject is instructed to do a "two-step pivot," by which the subject brings the back foot around one time and completes the turn on the second step. The subject then begins the "heel-toe" walk again for the nine steps. This test is administered according to NHTSA standards.

sobriety tests,[4] her slow response to his emergency equipment, the odor of alcohol, and her red, glassy eyes, Officer Taylor felt that the defendant was impaired and should not be operating a motor vehicle.

At that point, Officer Taylor read the Tennessee Implied Consent Law to the defendant and asked her if she would submit to a breath test. The defendant agreed to do so. She was placed in the back of Officer Taylor's police car, and he sat in the driver's seat so he could turn around. At this point, Officer Taylor asked the defendant the questions on the back of the Form #132[5] used by police. She responded that she did not have any illness or injuries, did not take any medications or drugs, had her last meal at 8:00 p.m., and had one mixed drink at approximately 9:00 p.m. The defendant told the officer that she had the mixed drink at Club Platinum on Hayes Street. Because the defendant's eyes were red, Officer Taylor asked how much sleep she had gotten in the past twenty-four hours, to which she replied seven hours. Officer Taylor testified that he did not do any paperwork during his observation of the defendant, which lasted approximately twenty-eight minutes. At the end of the observation period, Officer Taylor administered the breath test to the defendant, and she registered a 0.16%. After advising the defendant of the results, Officer Taylor asked if she wanted to submit to a blood test. He testified that he did not remember if the defendant stated that she wanted a blood test at that time, but she would have been given one if she had indicated that she wanted one. He remembered the defendant asking about the cost, and Taylor told her the cost. Taylor stated that if the defendant had said, "That's all right," he would have interpreted her response to mean "no," which he marked on the Form #132. He took the defendant straight to the jail.

Officer Taylor stated that he was trained and certified by the Tennessee Bureau of Investigation to give breath alcohol tests. His certification in the operation of the Intoxilyzer 1400 was entered into evidence. Although the trial judge would not allow the certificate of calibration from CMI, Inc., the maker of the particular Intoxilyzer 1400 used on the defendant, or the certification of calibration by the TBI for that machine into evidence based on a hearsay objection from defense counsel, the defendant made no objection to the officer's testimony that the machine (number 130) had been certified by the TBI on February 21, 1997. The printout for the defendant's breath test results of 0.167 was also entered into evidence through this witness. The videotape of

---

[4] Officer Taylor testified that the defendant showed four cues during the "walk and turn" test, which tests the subject's performance of divided attention or multi-tasking, balance, following instructions, and reactions. Checked on the Form #132 were: "cannot keep balance"; "misses heel-toe" during the first nine steps; "raises arms" during both the first and second nine steps; and "actual steps taken" were twelve during the first set of nine steps and ten during the second set. Our review of the Form #132 and Officer Taylor's testimony during cross-examination reveals that the defendant also had two cues during the "one-leg stand" test. These were: "sways while on one leg" between twenty-one and thirty seconds and "raises arms while on one leg" between eleven and twenty seconds and also between twenty-one seconds and thirty seconds.

[5] Defense counsel explained to the trial court that this form is the Metropolitan Police Department's DUI report.

the stop, field sobriety test, and arrest of the defendant was shown to the jury and entered into evidence.[6]

The officer explained why the video showed that the defendant had to retake the breath test after a first unsuccessful attempt. He stated that the Intoxilyzer Pack 1400 has a tone meter which indicates when a sufficient sample is being injected into the machine's chamber. To do the test correctly, the subject must blow a constant, steady breath for about eight to ten seconds. Once the chamber has been filled, the machine will cut off the test, and the subject stops blowing into it. The Intoxilyzer goes through some internal checks and gives a printout of the alcohol content of the subject's breath. On her first try, the defendant did not give a sufficient breath sample, and the machine self-aborted the first test. The procedure at this point was to recycle the Intoxilyzer and instruct the subject to perform again. The second time the defendant blew, a sufficient sample was obtained for the machine to analyze. Officer Taylor explained that the machine does all of the work internally, so if there is any interference or anything other than alcohol detected, the machine will self-abort the test. The printout will show that there was an insufficient sample and, in the defendant's case, the useless printout from the first test was destroyed. Officer Taylor testified that the defendant did not put anything into her mouth, smoke anything, belch, regurgitate, or do anything else that would upset the test while he was observing her. He also stated that he followed all of the appropriate procedures to get the results of the second test. After taking the defendant into custody, Officer Taylor attempted to secure her vehicle and found an open bottle of beer in the passenger side floorboard. After viewing the video, the officer acknowledged that the defendant initially stated that she wanted a blood test, but later said that she did not after talking to another officer on the scene.

On cross-examination, a copy of the Form #132 was entered into evidence through Officer Taylor. He stated that he could not tell if the defendant's driving was erratic or unlawful in any other way besides speeding, because she was so far ahead of him. The officer was confronted with his statement at the preliminary hearing in which he stated that the defendant did not weave in her lane as far as he could see. He stated that his trial testimony was the same.

After viewing the tape, Officer Taylor still was of the opinion that the defendant was unsteady as she exited her vehicle. He admitted that the defendant did not attempt to flee, did not lean against her car, or fall out of her vehicle. He also admitted that, from the odor of alcohol alone, he cannot tell what a subject has had to drink, how much, or over what period of time. He agreed that his training has taught him that ethyl alcohol has no odor but still stated that he smelled alcohol on the defendant. He did not form an opinion that probable cause existed to arrest the defendant at the time he smelled alcohol on her or when he saw her speeding but felt he might arrest her for reckless driving.

_____

[6]Our review of the videotape reveals that the camera in Officer Taylor's car was pointed forward throughout the observation period and administration of the alcohol breath test. This prevents us from observing the defendant during this time. However, the audio portion of the videotape, which contained the conversation between the officer and the defendant, is clearly audible.

-4-

Defense counsel reviewed with Officer Taylor the NHTSA[7] standard demonstrations and instructions given to the defendant before each field sobriety task, who said that he did not give her the instruction, "Do not hop or sway." The officer testified that the defendant said that she understood his instructions, and it was his opinion that she did understand. He explained that there are four cues in the "one-leg stand" test that are signs of intoxication, namely, the sway, raised arms, hopping on one leg, and putting the foot down before time is up. After observing the defendant's performance on the "one-leg stand" test, Officer Taylor had not yet formed an opinion as to whether probable cause existed to place the defendant under arrest. He testified that he had one more task to perform before doing so. The defendant was instructed on how to do the "walk and turn" test, and she seemed to understand. After observing four cues during the defendant's performance of this test, Officer Taylor then formed his opinion that probable cause existed for the defendant's arrest. Taylor agreed that the videotape showed that the defendant was not under arrest when he read her the Implied Consent Law but that she was placed under arrest after he read it. She was not handcuffed. He agreed with defense counsel that the defendant cooperated with him and did not have trouble getting into his patrol car. He stated that she had dry mouth and had discarded the gum she was chewing after finishing the field sobriety tests.

After seeing the videotape, Taylor admitted on cross-examination that his recollection at the preliminary hearing that he conducted the period of observation on the defendant outside his car was incorrect. He explained that he put the defendant in the back seat on the right-hand side and began his observation after he got into the car and observed the defendant until he started the Intoxilyzer. During the observation period, Officer Taylor read the defendant her Miranda rights. He testified that he had a card with those rights printed on it but did not get the card out to look at it. When he asked the defendant the questions listed on the Form #132 under "Suspect's General Health and Investigative Questions," Officer Taylor did not record her answers at that time. According to the Form #132, he observed the defendant for a little longer than twenty minutes before the breath test was given. Officer Taylor admitted that he could not verify the documents certifying the machine he used, but he could say those are the documents that are given out for the machines and that the machines are sent to the TBI lab.

Although he admitted that checking a subject's mouth prior to the breath test is part of the routine that an officer is supposed to follow, Officer Taylor stated that he did not check the defendant's mouth before he asked her to blow; however, he stated he had been watching her, and she did not put anything into her mouth. When Officer Taylor handed the defendant a new mouthpiece to use in the test, he did not look down into the box, because he could reach down and get it. The defendant had a problem with her first attempt to blow, and the machine was heard on the videotape to be printing something out. Officer Taylor stated that the machine printed out "insufficient sample." He explained that the portion of the printout for "subject test" would be blank and "insufficient sample" would be printed at the bottom with an asterisk right above it. The reading would be zero. He then had to start the sequence over again. Because the machine was between the

_____

[7]This stands for the National Highway Traffic Safety Administration. State v. Sensing, 843 S.W.2d 412, 414 (Tenn. 1992).

-5-

seats, near the officer's lap, and the mouthpieces are kept on the floorboard, Officer Taylor stated that he never took his eyes off the defendant. He explained that several times on her second attempt to complete the test, the defendant would blow up to a certain point and then stop. The Intoxilyzer would show "please blow," and Officer Taylor would instruct her again to blow out a steady, continuous breath.

In his testimony, Officer Taylor explained that a steady, continuous breath is necessary to get a sufficient sample to get an accurate breath count. He agreed that deep lung air is the type of sample needed by the computer in the machine to convert a breath alcohol reading into blood alcohol content. He stated that the machine is so sensitive that it can distinguish between deep lung air and regular air, and the Intoxilyzer will abort the test if deep lung air is not in the sample obtained. The videotape also showed Officer Taylor telling another officer at the scene that he expected the defendant to "blow a ten" (0.10) on the machine. He testified that he did not question the machine when the results showed the defendant had a 0.16% blood alcohol content, but he denied that he was relying on the machine over his ability as a police officer to recognize that someone is under the influence. He stated that he had been a police officer for sixteen years, six of those as a DUI Task Force officer. Officer Taylor testified he had attended classes where people drink, and he was supposed to guess their breath alcohol content. He felt he was good at doing so.

When asked by defense counsel if he allowed the defendant to practice the field sobriety tests, Officer Taylor stated that he did not. He also stated that it is not normal to walk heel-to-toe, and agreed that, if a person were allowed to practice, he or she would be able to do it better. He stated that he did not tell the defendant what she had to do to pass the tests. It was his opinion that the defendant was under the influence and that he had probable cause to believe she was under the influence, although he agreed that the jury makes that determination.

Defense counsel further cross-examined the officer about the videotaped conversation with the defendant concerning her desire to take a blood test after the breath test. Officer Taylor agreed that the videotape showed that the defendant responded, "Yes, I do." When the officer told her it would be at her own expense, she replied, "That's okay." It was Officer Taylor's recollection that the defendant decided not to take a blood test after another officer, who was a friend of the defendant, came to the scene and talked with her. He acknowledged that there was a break in the recording where the audio was off during the time that the defendant was talking with her friend but testified that the defendant stated she did not want the blood test before Officer Taylor got back in the car and turned the tape back on. The other officer was driving off at that time.

The State then rested its case. The defense called no witnesses, and the case went to the jury for deliberations. The jury ultimately found the defendant guilty of DUI per se.

**ANALYSIS**

**Admission of Intoxilyzer Test Results**

The general fundamental requirements for the admission of breath alcohol test results were established in State v. Sensing, 843 S.W.2d 412 (Tenn. 1992); State v. Bobo, 909 S.W.2d 788, 790 (Tenn. 1995); and State v. Deloit, 964 S.W.2d 909, 912 (Tenn. Crim. App. 1997). The Sensing standard requires that an officer be able to testify that: (1) the tests were performed in accordance with standards and procedures promulgated by TBI's forensic services division; (2) the testing officer was properly certified; (3) the breath testing instrument used was certified by the TBI, was regularly tested for accuracy, and was working properly when the test was performed; (4) the subject was observed for twenty minutes prior to the test and, during this time, did not have foreign matter in his mouth, did not consume alcohol, smoke, or regurgitate; (5) the officer followed the prescribed operational procedure; and (6) the testing officer identified the printout record offered into evidence as being the test result of the subject involved. Sensing, 843 S.W.2d at 416; Deloit, 964 S.W.2d at 912.

Once the State has shown all six Sensing requirements by a preponderance of the evidence, the test results are admitted. A trial court's decision to admit breath alcohol test evidence will not be disturbed on appeal unless the preponderance of the evidence is contrary to that decision. State v. Edison, 9 S.W.3d 75, 77-78 (Tenn. 1999).

The defendant contends that the trial court erred in admitting the results of the defendant's Intoxilyzer test, because the State failed to meet four of the Sensing requirements. Specifically, the defendant argues that the reliability of the test was compromised, because: (1) the test was not performed in accordance with the TBI's standards and operating procedure; (2) Officer Taylor did not properly observe the defendant for twenty minutes and failed to visually check the defendant's mouth before giving the test; (3) there was no evidence that the Intoxilyzer was properly certified, regularly calibrated, and working properly; and (4) there was no evidence that Officer Taylor followed the prescribed operational procedure. The defendant correctly argues that, if the State failed to satisfy Sensing, it could only get the test results admitted under traditional rules of evidence that would assure the reliability of the test. Deloit, 964 S.W.2d at 913. This would require a showing that the device was scientifically acceptable and accurate and that Officer Taylor was qualified to interpret the results for the jury. Id. at 911. According to the defendant, this was not done at trial; and, therefore, the evidence was not admissible.

We do not agree that the breath alcohol test results were inadmissible. After a careful review of the record, we conclude that the evidence does not preponderate against the trial court's decision to admit the Intoxilyzer results.

The defendant's contention that the State failed to establish that the defendant's test was performed according to TBI standards and procedures (Sensing requirement #1), as well as her contention that Officer Taylor did not properly observe her or check her mouth before giving the test (requirement #4), are without merit. Officer Taylor testified that he was trained and certified by the

TBI to operate the Intoxilyzer 1400 and administer breath alcohol tests. His certification was entered into evidence. He then described how he conducted the test on the defendant and what procedure he used to get an accurate reading. He testified that he observed the defendant uninterrupted for over twenty minutes and that she put nothing in her mouth during that time.[8] When the defendant's first breath test was insufficient, Officer Taylor testified that the procedure was to recycle the Intoxilyzer and try again. In addition, he stated that he followed all of the appropriate procedures in obtaining the test results from the second test. This testimony is stronger than that of the officer in State v. Edison, in which the supreme court determined that the Sensing requirement was met that proper procedures be followed during the test. In that case, the officer testified that he could not remember if he followed the proper procedures but knew he must have, since there are "just certain procedures that you have to follow to run the test." Edison, 9 S.W.3d at 79. In the present case, Officer Taylor testified that he did follow all the proper procedures, which was more definite than the officer's testimony in Edison.

Although Officer Taylor admitted on cross-examination that he did not visually inspect the defendant's mouth before giving the breath test, this is not fatal to the State's Sensing proof. This court has not required that an officer search a subject's mouth visually if he: (1) has determined that foreign matter has been removed prior to the twenty-minute observation period and (2) testifies that he continuously observed the test subject for the required period, during which the subject's mouth remained clear. See State v. Deloit, 964 S.W.2d 909, 916-17 (Tenn. Crim. App. 1997) (discussing State v. Harold E. Fields, No. 01C01-9412-CC-00438, 1996 WL 180706 (Tenn. Crim. App., Nashville, Apr. 12, 1996)); State v. Jarnagin, No. E1998-00892-CCA-R8-CD, 2000 WL 575232 (Tenn. Crim. App., Knoxville, May 12, 2000). This procedure insures that nothing new or unknown enters the subject's mouth that would skew the test results. State v. Cook, 9 S.W.3d 98, 100-01 (Tenn. 1999). In the present case, Officer Taylor testified that the defendant spit out her gum before he continuously observed her for the required twenty-minute period. He did not look away from her to do paperwork or to administer the breath test. Therefore, we cannot conclude that the evidence in the record preponderates against the trial court's determination that the proper procedures and observation of the defendant were followed.

Evidence was also presented that the particular Intoxilyzer used in the defendant's test was properly certified, calibrated, and working properly (Sensing requirement #3). Officer Taylor testified that the machine had been certified by the TBI on February 21, 1997, less than two months before it was used on the defendant. He also stated he knew that the machine was sent to the TBI lab and that the certification of calibration from the TBI was returned with the machine. Again, this testimony is more specific than that presented in State v. Edison, in which this Sensing requirement was met by an officer's testimony that the certification of calibration was posted at the jail, and the machine was checked every three months, although he did not know the date of the last calibration. State v. Edison, 9 S.W.3d 75, 78 (Tenn. 1999). We conclude that the evidence does not

---

[8] The audio portion of the videotape of the defendant's arrest reveals that on three occasions Officer Taylor advised the defendant regarding any foreign objects in her mouth: "Do you have anything in your mouth?"; "Make sure you put nothing in your mouth"; and "Put nothing in your mouth."

preponderate against the trial court's finding that the <u>Sensing</u> requirement of a properly calibrated and working instrument was met by the State.

Further bolstering the State's argument, we conclude that the trial court should have allowed the certificate of calibration to be entered into evidence. In <u>Sensing</u>, the court stated:

> The forensic services division inspects, repairs and maintains all units previously certified, including use of a laboratory computer controller to poll each instrument and correlate all test data of each instrument for clarification of instrument performance. Every 90 days forensic services division personnel conduct tests of each instrument under laboratory control conditions and record the results, noting any required adjustments or repairs of each unit. The certification also provides that upon request of the court, district attorney, defendant, or other person or party having an interest in the use of the test performed on an approved breath testing instrument an official copy of those standards and procedures will be certified pursuant to T.C.A. § 38-6-107 and delivered to the requesting party. We are of the opinion that this procedure to supply records also conforms with the provisions of Tennessee Rule of Evidence, 803(8) as an exception to the hearsay evidence rule.

843 S.W.2d at 415-16. It is the statutory duty of the forensic services division to maintain and certify alcohol breath testing instruments of those police departments participating in the purchasing program with the state. Tenn. Code Ann. § 38-6-103(d)(2), (g) (1997). The certificate of calibration from the bureau is part of this process and is given to the police departments when the instrument is calibrated. At trial, Officer Taylor testified that this certification was given back to the department after the machine was sent to the TBI for calibration. Barring any other evidentiary defects, this appears to fit within Tennessee Rule of Evidence 803(8), which carves out an exception to hearsay for a report from a public agency issued pursuant to a duty imposed by law. However, in the present case, the testimony of Officer Taylor was sufficient to establish that the machine was working properly, even in the absence of the certificate of calibration.

We conclude that the evidence does not preponderate against the trial court's determination that the State met its burden of proving all of the <u>Sensing</u> requirements to admit the alcohol breath test.

Since we have concluded that the Intoxilyzer results were properly admitted into evidence, we now turn to the defendant's contention that the trial court erred in denying her motion for acquittal or a new trial. When a motion for acquittal is presented to the trial court, the court is only concerned with the legal sufficiency of the evidence, rather than the weight of the evidence presented. <u>State v. Blanton</u>, 926 S.W.2d 953, 957 (Tenn. Crim. App. 1996). In determining sufficiency, the trial court must consider the parties' evidence, disregard the defendant's evidence which conflicts with that of the State, and afford the State the strongest legitimate view of the

evidence, including all reasonable inferences. Id. at 957-58. The State's proof was sufficient to establish all elements of the offense of DUI, and the trial court was correct in denying the defendant's motion for acquittal or for a new trial based upon improper admittance of scientific evidence.

### Excessive Sentence

The defendant further contends that the trial court imposed too harsh a sentence for the DUI per se conviction. From the record provided, we cannot determine whether the trial court acted properly or not. It is the appellant's obligation to prepare an adequate record on appeal in order to have an issue considered by this court. No transcript of the sentencing hearing is contained within the record, which precludes us from considering this issue. Tenn. R. App. P. 24(b); State v. Draper, 800 S.W.2d 489 (Tenn. Crim. App. 1990).

### CONCLUSION

Upon our review, we conclude that the evidence does not preponderate against the trial court's determination that the defendant's alcohol breath test results met all the requirements of Sensing and were admissible. Further, we hold that we are precluded from considering the defendant's sentence under Rule 24 of the Tennessee Rules of Appellate Procedure. Therefore, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE