# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

## MAY 1999 SESSION

FILED

July 20, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 03C01-9707-CR-00270 |
| | ) | |
| vs. | ) | Blount County |
| | ) | |
| ALBERT L. NORTON, | ) | Hon. D. Kelly Thomas, Jr., Judge |
| | ) | |
| Appellant. | ) | (DUI 2nd Offense) |
| | ) | |

FOR THE APPELLANT:

**GEORGE H. WATERS**
Asst. Public Defender
419 High Street
Maryville, TN 37804

FOR THE APPELLEE:

**PAUL G. SUMMERS**
Attorney General & Reporter

**ERIK W. DAAB**
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
Nashville, TN 37243

**PHILIP MORTON**
Asst. District Attorney General
Blount County Courthouse
363 Court Street
Maryville, TN 37804

OPINION FILED: _____

**AFFIRMED**

**JAMES CURWOOD WITT, JR., JUDGE**

**OPINION**

The defendant, Albert L. Norton, appeals his Blount County Circuit Court jury conviction of second-offense DUI, a class A misdemeanor. He does not challenge his jail sentence of eleven months, 29 days at 90 percent, to be probated after serving 90 days, a $2,500 fine, and a two-year license revocation. Rather, he challenges his conviction by raising the following issues:

1. The evidence was insufficient to support his conviction.

2. The trial court erred by allowing evidence of the defendant's blood test result despite the failure to establish a proper chain of custody of the blood sample.

3. The trial court erred in allowing evidence of drugs being present in the defendant's blood sample.

4. The trial court erred by admitting testimony that the defendant failed to pass a horizontal gaze nystagmus field sobriety test.

After a review of the record, the briefs of the parties, and the applicable law, we affirm the judgment of the trial court.

Sergeant Mark Taylor of the Maryville Police Department arrested the defendant for DUI on March 7, 1995, after watching the defendant swerve his car across the street centerline on two or three occasions and make a wide left turn during which he appeared to strike a curb. Taylor stopped the defendant, who had blood-shot eyes, smelled of alcohol, fumbled with his wallet when trying to extract his drivers license, and staggered upon getting out of the car. The defendant told Taylor he had a couple of beers earlier in the day and that he was on three types of medication, including a pain medicine and a muscle relaxant. Taylor administered three field sobriety tests -- the horizontal gaze nystagmus (HGN) test, the one-leg stand, and the walk and turn test. After explaining that the HGN test

2

involved an assessment of the effects of intoxicants on the muscles in the eyes, Taylor testified that the defendant tested "positive" on all six "clues" for which the testing officer looks. On the one-leg stand, the defendant dropped his foot a few times while counting and finally put his foot down and said he could not finish the test. During the walk and turn test, he stepped off the line twice, used his arms to keep his balance, missed connecting heel to toe three times, and incorrectly executed the turn.

Michael J. Lyttle, a forensic scientist with the Tennessee Bureau of Investigation (TBI), analyzed the defendant's blood sample for the presence of drugs. He found the presence of 1.1 micrograms per milliliter of carisoprodol, a muscle relaxant, and testified that the therapeutic range[1] for carisoprodol is ten to 40 micrograms per milliliter. He found the presence of 9.2 micrograms per milliliter of meprobamate, which is a metabolite of carisoprodol. The therapeutic range for meprobamate is 3.0 to 26 micrograms per milliliter. He found the presence of dihydrocodeinone, a narcotic analgesic, for which the therapeutic range is .002 to .024 micrograms per milliliter. The concentration of dihydrocodeinone was below the level of .1 micrograms per milliliter, and by policy, the TBI lab does not "quantitate" concentrations below this level. It simply refers to the result as being "less than" .1 micrograms per milliliter. Nevertheless, Lyttle assessed the dihydrocodeinone level in order to determine if it exceeded the .1 level and found the level to be .05, which is less than .1 but about twice .024, the upper limit of the therapeutic range. Lyttle testified that all of these drugs are depressants that in general have a sedative effect.[2]

---

[1]Lyttle testified that "therapeutic range" refers to "the range that you would expect to see when that drug is having its prescribed effect on the body."

[2]Although not mentioned by Lyttle in his testimony, the TBI lab report showed the following additional substances were present in the blood sample: cocaine, "less than .1 UG/ML"; cocaethylene, "less than .1 UG/ML"; "benzoylecgonine (cocaine metabolite) 1456 NG/ML." At a jury-out hearing, the trial court excluded from Lyttle's proposed testimony evidence of the cocaine and cocaine-related substances.

Jerry Main, another forensic specialist with the TBI, testified that he conducted the analysis of the defendant's blood sample for the purpose of ascertaining the presence of alcohol. Specifically, he found an alcohol concentration of .006 percent. The TBI considers results of .01 percent or less to be "negative."

At a jury-out hearing to determine the nature of her expertise and the scope of her testimony, Jean Ezell, the director of the pharmacy at Blount Memorial Hospital, testified that drug level data could not be used to determine the actual effect that a given drug level would have on a specific individual, but that she could opine generally as to the effects of drug dosages. She reviewed the TBI drug screen report and opined that the meprobamate and dihydrocodeinone were at levels significant enough to cause some impairment, especially when one considers the likelihood of an "additive" or "synergistic" effect of combining the two drugs. Before the jury, Ezell confirmed that the three substances mentioned by Lyttle were depressants and that if she were filling prescriptions for these prescription-only drugs, she would affix labels warning the consumer of the effects of sedation and dizziness. The dihydrocodeinone was present in the defendant's blood sample at a level double the "normal peak." The carisoprodol was present at a level below the therapeutic range, but Ezell explained that it metabolizes into meprobamate and that, when drugs metabolize into other active drugs such as meprobamate, the metabolite itself may have more effect than the "original" drug. Furthermore, she testified that the TBI report revealed the presence of cocaine,[3] a central nervous system stimulant, in the defendant's blood sample at a level less than .1 micrograms per milliliter. She explained generally the increased potency that could be expected because of the additive and synergistic effects of combining the drugs found in the defendant's blood, but she stressed that she could not opine as to the

_____

[3]Based upon Ezell's knowledge of the effects of cocaine which was revealed through her proffered testimony, the trial court allowed Ezell to testify before the jury about the cocaine and cocaine-related substances mentioned in the TBI lab report.

4

specific effect of any of these drugs on the defendant. Because there are "extensions of the effect of the drug, . . . it can vary from patient to patient. So, I think it would be difficult to say, you know, a certain level always causes a certain effect." Consequently, she admitted, it would be possible that the defendant would be able to operate a motor vehicle, despite the drugs revealed by the drug screen.

The defendant did not testify. The only proof offered by the defendant was the testimony of Thomas Ned Lee, Jr. The defendant visited Lee on the evening of March 7, 1995. Lee was working on the bathroom in his house, and the defendant was with him in that confined space. Lee did not smell alcohol on the defendant and did not detect the defendant acting "funny." He said the defendant rarely drank, and on that evening he appeared normal.

Based upon the evidence as summarized above, the jury convicted the defendant of DUI.

## 1. Sufficiency of the Evidence

It is well established that a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the theory of the state. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978); State v. Townsend, 525 S.W.2d 842, 843 (Tenn. 1975). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978).

Moreover, a verdict against the defendant removes the presumption of innocence and raises a presumption of guilt on appeal, State v. Grace, 493 S.W. 2d 474, 476 (Tenn. 1973); Anglin v. State, 553 S.W.2d 616, 620 (Tenn. Crim. App. 1977), which the defendant has the burden of overcoming. State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977).

5

Most significantly, where the sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2782 (1979); Tenn R. App. P. 13. See also, State v. Williams, 657 S.W.2d 405 (Tenn. 1983). This rule applies to findings based on both direct and circumstantial evidence. State v. Thomas, 755 S.W.2d 838, 842 (Tenn. Crim. App. 1988). Circumstantial evidence alone may be sufficient to convict one of a crime. State v. Boling, 840 S.W.2d 944, 947 (Tenn. Crim. App. 1992).

In reviewing the sufficiency of the convicting evidence, we consider all of the evidence, including any evidence which we may conclude was inadmissible. State v Bernard T. Anderson, No. 02C01-9710-CR-00394, slip op. at 22 (Tenn. Crim. App., Jackson, Apr. 23, 1999); State v. Longstreet, 619 S.W. 2d 97, 100-01 (Tenn. 1981).

Driving under the influence of a drug or intoxicant is proscribed by Tennessee Code Annotated section 55-10-401 which provides:

> It is unlawful for any person to drive . . . any . . . motor driven vehicle on any of the public roads and highways . . . or streets . . . while . . . [u]nder the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system.

Tenn. Code Ann. § 50-10-401(a) (1998). It is no defense to a charge of driving while under the influence that the offender is a lawful user of the active drugs. Tenn. Code Ann. § 50-10-402 (1998).

The evidence in the light most favorable to the state shows that the defendant drove erratically, had blood-shot eyes, smelled of alcohol, fumbled with his wallet, staggered, and failed to pass three field sobriety tests. He admitted to drinking beer and to taking prescription medications. The presence of prescription medications was confirmed by blood analysis, and the testimony showed that the

defendant's drug levels, especially when the drugs were combined, could impair the defendant as a motor vehicle operator. We realize that the blood-alcohol test result could have served as a basis for impugning the testimony of Sgt. Taylor, but the jury had the prerogative to accept or reject Taylor's testimony. The verdict suggests that they accredited his testimony, and this court is neither permitted to substitute our judgment on credibility issues for that of the trier of fact nor to reweigh the evidence.

This court has previously found sufficient evidence of DUI when that evidence was remarkably similar to the evidence now before us. In State v. Kenneth Lee Abbott, No. 02C01-9311-CC-00263 (Tenn. Crim. App., Jackson, July 19, 1995), perm. app. denied (Tenn. 1995), the police officer witnessed the defendant driving erratically by weaving back and forth, crossing the centerline, and making a wide turn. The defendant had blood-shot eyes and slurred speech. He failed two field sobriety tests. Kenneth Lee Abbott, slip op. at 2. A blood test revealed the presence of two tranquilizer drugs. Id. A pharmacist testified as to the effects of the drugs. Id. One was within the therapeutic range, although the level of the other was well above the therapeutic range. Id. He admitted that he could not opine as to the effects of the drugs on the defendant. Id. Abbott offered proof that he appeared normal prior to the arrest. Id. This court held that evidence was sufficient based upon the officer's testimony about the defendant's condition and the expert's testimony, including the testimony about the drugs' "usual effects." Id.

Driving under the influence may be shown by circumstantial evidence. State v. Lawrence, 849 S.W.2d 761, 763 (Tenn. 1993); State v. Corder, 854 S.W.2d 653, 654 (Tenn. Crim. App. 1992). The proof in the present case was sufficient to allow a rational jury to conclude beyond a reasonable doubt, based upon circumstantial evidence, that the defendant was driving under the influence.

7

## 2. Failure to Establish Chain of Custody of Blood Sample

Sergeant Taylor obtained the samples from the nurse who drew the blood from the defendant in Taylor's presence at the hospital. Taylor then delivered the samples to the police department's evidence custodian. Although the defendant objected when Taylor testified that the samples were sent to the TBI laboratory, the trial court allowed Taylor to testify that the custodian sends the samples to the lab. The evidence custodian did not testify, and no one testified that the samples brought in by Taylor were the same ones sent to and received from the lab. Nevertheless, the defendant failed to object when the lab analysis reports were admitted into evidence. The defendant asks that the failure to require the state to establish a chain of custody be reviewed as plain error. See Tenn. R. App. P. 36(a); Tenn. R. Crim. P. 52(b).

However, the state has correctly pointed out that this issue was not raised in the defendant's motion for new trial. Tennessee Rule of Appellate Procedure 3(e) requires that in a case tried by a jury such issues must be included in the motion for new trial, "otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e). Under all of the circumstances, this is a proper case in which to hold that the issue is waived under Rule 3(e), and we so hold.

## 3. The Trial Court Erred in Allowing Evidence of the Presence of Drugs in the Defendant's Blood Sample

In this issue the defendant claims that the trial court erred (1) in admitting the TBI drug-screen report and testimony concerning the presence of drugs in the defendant's blood and (2) in allowing testimony about the drugs without interpretation of the data and about the import of the drugs.

First, we address the issue of admitting the report and Lyttle's testimony which showed the presence of various drugs. Essentially the defendant argues that such evidence was irrelevant, was prejudicial, and did not meet the

applicable test for the admissibility of scientific or technical evidence. The defendant maintains that in the absence of testimony about "the significance of the drug levels, the evidence of drugs in the lab report was more prejudicial than probative." By "significance of the drug levels," the defendant refers to the effect of the drugs "on Defendant's or any other person's ability to perform physical tasks." He also complains that the evidence of the presence of dihydrocodeinone and the cocaine substances was not supported as scientific evidence because the levels of these drugs were too low to be quantified.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The issue of allowing expert evidence is related to the question of relevance. An expert may testify and give his or her opinion on facts in issue if (1) the expert is "qualified by knowledge, skill, experience, training, or education" and (2) the expert's "scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Tenn. R. Evid. 702.

After jury-out hearings, the trial court accepted both Lyttle and Ezell as expert witnesses. It is within the trial court's discretion to allow expert testimony. State v. Williams, 675 S.W.2d 405, 411-412 (Tenn. 1983). Lyttle testified to the levels of the various drugs in the defendant's blood and what the general effects on the central nervous system were. He testified that carisoprodol was present at a level that fell well within the therapeutic range and that dihydrocodenione was present at a level that was twice the maximum therapeutic dosage. He testified

9

without contradiction that he was qualified to perform and did perform the tests to determine the drug levels. We conclude that the proof of the drug levels as presented through the report and the oral testimony of Lyttle was properly admitted. It was relevant, not unduly prejudicial, and was properly offered as expert testimony under evidence rule 702.

Next, we review the defendant's complaint that the testimony about the import of the drugs and the fact that the drug levels, although scientific or technical in nature, were not interpreted for the jury. First we consider testimony about the three prescription drugs, carispodrodal, meprobamate, and dihydrocodeinone, and then we will consider the non-prescription, but illicit, cocaine substances, cocaine and benzoylecogonine.

In Kenneth Lee Abbott, this court considered the expert testimony of the "usual effects" of the drugs found in Abbott's blood in determining that all the evidence was sufficient to support his DUI conviction. Kenneth Lee Abbott, slip op. at 2. Even though the Kenneth Lee Abbott court was not dealing with an admissibility issue, its review of the "usual effects" evidence in assessing the sufficiency of the proof belied no concern for the probative value of testimony about the general effects of drug levels on normal persons, the "usual effects." In the present case, the state offered ample evidence of the usual effects of the drugs. This evidence made it more probable "than it would be without the evidence" that the defendant was under the influence of substances enumerated in code section 50-10-401. See Tenn. R. Evid. 401. The relevance of the evidence was not outweighed by any unfair prejudice or any other factor listed in Rule 403. Moreover, Lyttle and Ezell were expert witnesses by reason of knowledge, experience, training, and education, and they were qualified to give their testimony, including opinions, regarding their scientific or specialized knowledge about the usual effects of the drugs. See Tenn. R. Evid. 702. Ezell gave cogent testimony about the effects of which prescription drugs were within and which exceeded the therapeutic

10

range. She testified about the likelihood of additive or synergistic effects of combining the drugs. We agree with the trial court that this evidence was admissible.

The defendant argues that this court's holding in State v. Jim Smith, No. 03C01-9312-CR-00398 (Tenn. Crim. App., Knoxville, July 11, 1994), perm. app. denied (Tenn. 1994) requires reversal of these evidentiary rulings of the trial court. In Jim Smith, the defendant was on trial for murder and wished to show that the *victim's* urine tested positive for cocaine metabolites in order to support the defendant's mutual combat defense. The trial court rejected Smith's proffer of the cocaine evidence because the pathologist who performed the drug screen testified that the screen was performed for treatment purposes and would "always be sent off for a confirmatory study before it was ever reported as positive." The confirmatory study was not performed. Id. at 3. The pathologist testified that confirmation is "always required" because of the possibility that "other medications could cross-react with the screening test and yield false positive results." Id. The trial court excluded the test results on the basis of unreliability. In affirming the exclusion of this evidence, this court commented that the record lacked any evidence to indicate "when the drug was ingested or when the individual may have been under the drug's influence" and that "a trace of cocaine may be irrelevant and thus inadmissible." The Smith court cited two Florida cases, State v. McClain, 525 So. 2d 420 (Fla. 1988), and West v. State, 553 So. 2d 254 (Fla. Dist. Ct. App. 1989), which turned upon the exclusion of evidence of "trace" amounts of cocaine in the blood of the defendants who were being tried for substance-related vehicular homicides.

Smith is distinguishable from the case at bar in two respects. First, the testimony about two of the prescription drugs, meprobamate and dihydrocodonione, showed that these substances were present in significant amounts. We have found no holding of this court which requires expert proof about

11

the timing of drug ingestion as related to the drug's influence and the driving of a vehicle where the drugs were present in significant amounts according to expert testimony. Second, unlike the evidence proffered by the defendant in <u>Smith</u>, the admissibility of evidence in the present case is mandated by statute. <u>See</u> Tenn. Code Ann. § 55-10-410(d) (1997) ("The certification [attested by the TBI] . . . shall . . . be admissible in any court, in any criminal proceeding, as evidence of the facts therein stated, and of the results of such tests. . . . ").

The defendant's argument based on <u>Smith</u> concerning the evidence of cocaine is more in point. After hearing the jury-out proffer of Lyttle's testimony, the trial court initially excluded any reference to the cocaine substances until "some additional testimony comes out on it." However, in the jury-out proffer of Ezell's testimony she testified that although she was not an expert on "illicit substances," she was familiar with the effects of cocaine, based upon her educational training and her knowledge of the "effects of cocaine after ingestion in the human body or the central nervous system." She opined that the cocaine metabolite, benzoylecgonine, was present at a level to have some effect on a person. The test level of 1456 nanograms per milliliter exceeded the peak therapeutic level of 923 nanograms per milliliter. The trial court overruled the defendant's objection to disallow Ezell's testimony and determined that she could testify about the finding of cocaine and a cocaine metabolite, benzolecgonine, in the lab report. Before the jury, Ezell testified that cocaine is a central nervous system stimulant that can block nerve impulses and constrict blood vessels with a typical result of stimulation and hyperactivity. She acknowledged that the TBI lab report showed that cocaine was present at a level of less than .1 micrograms per milliliter and that it did not specify the precise amount of cocaine. Beyond these statements, no other proof was offered before the jury about either the cocaine or the level of cocaine metabolite.

The proffer showed that the level of cocaine was less than .1 MG/ML and that the exact level was not determined. We agree with the defendant that this

information *alone* would have been an insufficient basis for an expert concluding that the presence of cocaine was meaningful in this DUI case. However, a cocaine metabolite, benzolecgonine, was present at a meaningful level and makes the chemical findings as to both substances relevant. The trial court did not abuse its discretion in allowing testimony about these two substances. The presence of the cocaine in combined form with a significant level of metabolite made it more probable that the defendant was driving under the influence. See Tenn. R. Evid. 401. Although cocaine was the only illicit drug found in the lab report, the prejudice that may have resulted from the reference to cocaine was properly viewed as not outweighing the probative value. See Tenn. R. Evid. 403.

Of course, Ezell's testimony before the jury did not track her proffered testimony. Before the jury, the state failed to elicit some of the specific information on the level and the effect of the cocaine metabolite that Ezell imparted during her proffer. The result was the jury heard only that the report showed the presence of cocaine at a level of "less than" .1 micrograms per milliliter, without the auxiliary information of the metabolite level which boosted the relevancy value of the unquantified level of unmetabolized cocaine. It may have been error to allow this testimony in this incomplete form; however, the defendant did not object, move to strike or for a mistrial, nor ask for curative instructions. "[R]elief may not be granted in contravention of the trier of fact." Tenn. R. App. P. 36(a). To the extent that the defendant's claim of error is addressed to the actual testimony of Ezell, the claim has been waived. Furthermore, we view as harmless any error in allowing Ezell's testimony to be received without curative action. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). Had the cocaine at less than .1 microgram per milliliter been the only cocaine substance found, the evidence of it might well have been irrelevant under evidence Rule 401 or prohibitively prejudicial under Rule 403, and yet, this is essentially the only evidence about the level of cocaine that the jury heard. The irony is that the full story about the cocaine -- the level of the metabolite which we have deemed admissible -- was more cogent, specific and damaging to the

13

defendant than the evidence of unmetabolized cocaine about which Ezell testified. Indeed, given the irony, the defendant may well have decided not to object or seek curative instructions for fear that testimony about the 1456 nanograms per milliliter of cocaine metabolite would emerge. Moreover, any retrial of the case would only result in admitting cocaine evidence that would be more damaging than what was admitted below. Under these circumstances, any error that can be ascribed to the use of Ezell's testimony was harmless.

4. Horizontal Gaze Nystagmus Evidence

The state concedes that it did not properly qualify Sgt. Taylor as an expert on the HGN test and that the HGN test results were inadmissible in light of our supreme court's holding in State v. Murphy, 953 S.W.2d 200 (Tenn. 1997). However, the state argues that the error was harmless. See Tenn. R. App. P. 36(b).

This court has upheld DUI convictions despite the use of inadmissible evidence when the admissible evidence overwhelmingly supported a finding of guilt. See e.g., State v. Mark Bateman, No. 01C01-9608-CC-00377, slip op. at 6 (Tenn. Crim. App., Nashville, Dec. 17, 1997) (trial judge in bench trial affirmatively found that evidence independent of the Sensing-deficient intoximeter results supported DUI conviction); State v. Greene, 929 S.W.2d 376, 380 (Tenn. Crim. App. 1996) ("any arguable" error in admitting HGN proof harmless in light of other proof, including .22 percent blood alcohol test result). But see State v. James Dale Grindstaff, No. 03C01-9704-CR-00139 (Tenn. Crim. App., Knoxville, Mar. 23, 1998). In the present case, the other proof of driving while under the influence was cogent and consisted of two field sobriety test results, the observations of a trained officer, and the results of chemical tests. Given the overwhelming nature of the total evidence, we hold that the erroneous use of the HGN test results was harmless.

In reaching this conclusion, we have reviewed James Dale Grindstaff, a case in which this court reversed a DUI conviction because, in part, Murphy-

14

deficient evidence of the results of the HGN test was admitted. James Dale Grindstaff, slip op. at 7. However, in addition to the Murphy error, the trial court in James Dale Grindstaff also erroneously admitted evidence in violation of the State v. Sensing, 843 S.W.2d 412 (Tenn. 1992), requirement that a DUI arrestee must be observed for twenty minutes prior to an intoximeter test as a prerequisite for making the intoximeter test results admissible. James Dale Grindstaff, slip op. at 5-6. Even though the arresting officer testified that Grindstaff had blood-shot eyes, slurred speech, an alcohol odor, and "performed poorly on . . . two field sobriety tests besides" the HGN test, there was evidence that Grindstaff's speech impediment, a leg injury, fatigue, and limited education may have contributed to some of the field observations and test results. James Dale Grindstaff, slip op. at 6. Significantly, the officer did not observe Grindstaff's vehicle "weaving, crossing a line," or otherwise being driven erratically. Id. Given the "fairly balanced" evidence on the issue of intoxication without the HGN and intoximeter test results, this court held that the "cumulative effect" of the errors in admitting the HGN and intoximeter tests results more probably than not affected the outcome of the trial. Id.

James Dale Grindstaff is distinguishable from the present case. Here, the officer witnessed the defendant driving erratically, and the state presented substantial proof that the defendant was under the influence of prescription medications. Furthermore, we have found no other operable error which, when combined with the HGN error, would yield a cumulative effect. These factors, combined with the results of two field sobriety tests other than the HGN test and the officer's testimony about palpable indicators of intoxication observed in the defendant's behavior, support our conclusion that the erroneous use of the HGN test results was harmless.

### 5. Conclusion

We conclude that no reversible error was committed below. The judgment of the trial court is affirmed.

15

_____
JAMES CURWOOD WITT, JR., JUDGE

CONCUR:


_____
JOHN EVERETT WILLIAMS, JUDGE


_____
ALAN E. GLENN, JUDGE

16