# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
June 23, 2009 Session

## STATE OF TENNESSEE v. ELIZABETH GAY TINDELL

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 261238     Don W. Poole, Judge**

---

**No. E2008-02635-CCA-R3-CD - Filed June 22, 2010**

---

Appellant Elizabeth Gay Tindell was arrested for driving under the influence (DUI) when, after a night out with friends, she stopped on the side of the road to call for a ride home. A sheriff's deputy saw her pull over and, concerned that she might be in distress, approached her car. During his stop, the deputy concluded Appellant was intoxicated, and a subsequent breathalyzer test revealed her blood alcohol content was .20 percent. A Hamilton County Grand Jury indicted her for DUI and DUI per se, and she was convicted after a bench trial. She appeals, contending that the trial court erred in: (1) denying her motion to suppress evidence from the deputy's stop; (2) admitting evidence of the breathalyzer test results; (3) denying, in an issue of first impression, her motion to compel discovery of the source code for the breathalyzer device used to test her blood alcohol content; (4) finding sufficient evidence to convict her of DUI per se; and (5) finding sufficient evidence to justify the court's conclusion that Appellant was subject to the enhanced seven-day incarceration minimum. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Jerry H. Summers and Marya L. Schalk, Chattanooga, Tennessee, for the appellant, Elizabeth Gay Tindell.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; William H. Cox, District Attorney; and James A. Woods, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I.  Factual Background

Around 11:20 p.m. on March 24, 2006, Appellant was driving home after a night out.[1] She had been drinking, and she realized she was too impaired to drive.  She pulled into the driveway of a recycling center, which had closed for the day.  She then called her husband to pick her up.  Hamilton County Sheriff's Deputy Eliott Mahaffey saw Appellant pull off the highway.  He stopped and got out to check on her.  The "giggly" Appellant was dialing her husband's number as Deputy Mahaffey approached.  When Deputy Mahaffey asked if everything was okay, Appellant responded that she was calling her husband because "she was too drunk to drive."  Deputy Mahaffey's subsequent investigation, which included a breath alcohol test, confirmed that Appellant was indeed drunk, and a Hamilton County Grand Jury indicted Appellant for DUI.

Appellant filed a series of pre- and post-trial motions, and the trial court held hearings on some of them.  A bench trial ensued, and the parties agreed to allow the testimony from some of the hearings to serve as trial testimony.  The following is our summary of the pertinent portions of the record.

## A.  Motion To Suppress

Appellant filed a motion to suppress on December 11, 2006, contending Deputy Mahaffey improperly seized her when he stopped to investigate why she pulled over.  The trial court held a hearing on the motion on March 21, 2007.

At the hearing, Deputy Mahaffey testified that he saw Appellant pull into the driveway of the recycling facility.  The facility was gated and locked.  He pulled up behind her, but he did not activate his cruiser's blue lights.  Instead, the reserve deputy accompanying him activated the cruiser's rear amber lights as well as the white "take-down" lights.  The rear amber lights were not visible from the front of the cruiser, but the take-down lights were.

Deputy Mahaffey explained that he did not stop in response to a call about Appellant but to make sure she did not need assistance.  He had never seen a car in the recycling center's driveway that late at night.  He parked his marked cruiser behind Appellant at an

---

[1]  Between her arrest and the present appeal, Appellant married and changed her name. Consequently, throughout the record Appellant is referred to as Elizabeth Gay Tindell, Elizabeth Tindell, Elizabeth Higgins, and Elizabeth Tindell Higgins.  As explained in a previous order, we continue to use the name as it appears in the indictment. Regardless, we refer to her as "Appellant" in this opinion.

angle, leaving it partly in the emergency lane running along the highway. He left enough room between his car and Appellant's to allow her to turn around if necessary. Deputy Mahaffey testified that he would have allowed Appellant to turn around and leave had she tried but that he would have followed her. At the time he stopped behind Appellant, Deputy Mahaffey did not believe, nor did he have reason to believe, that she had committed an offense; he thought she might have been in distress.

Deputy Mahaffey testified that as he approached the vehicle, Appellant was dialing a number into her cellular telephone. He waited until she had completed dialing the number, and he then asked if everything was okay. Appellant, whom Deputy Mahaffey described as "giggly," said she was "calling her husband to come pick her up" because "she was too drunk to drive." Deputy Mahaffey testified that he overheard a portion of Appellant's telephone conversation, including a statement she made that she was not in trouble.

Samuel Roistacher, the part-time Hamilton County Sheriff's Reserve Deputy accompanying Deputy Mahaffey that night, testified that he switched on the cruiser's amber lights when Deputy Mahaffey pulled up behind Appellant. Deputy Roistacher denied turning on any of the cruiser's other lights, including its take-down lights, and he testified that no one turned on its blue lights or strobe lights.

Deputy Roistacher testified that Deputy Mahaffey pulled into the recycling center's driveway at approximately 11:20 p.m., leaving about one car length between the two cars. Deputy Roistacher who, like Deputy Mahaffey, was wearing a Hamilton County Sheriff's Department uniform, did not approach the car. He did not hear any of the conversation between Appellant and Deputy Mahaffey.

Appellant testified that she first called her husband around 11:14 p.m. to tell him she was on her way home. She admitted that she had been drinking that night and that she stopped at the recycling center to call her husband again at 11:21p.m. When she stopped, she turned off the car, took the keys out of the ignition, and threw them into the passenger seat. She testified that as she was calling her husband, she saw an officer pull up with his blue lights activated. She noted that the squad car pulled up behind her at an angle, blocking her car into the driveway. When the officer arrived, Appellant "absolutely" felt she was under his authority. However, Appellant also testified that she would have pulled over any time an officer approached her from behind with any lights, other than headlights, activated.

Appellant's husband, Brent Phillip Higgins, testified that he went to get Appellant after she called. When he arrived, he found two cruisers with their blue lights flashing. He also testified that he thought Appellant told him during the 11:21p.m. call that the cruiser that pulled up behind her had activated its blue lights. Finally, he testified that it would have been

possible to turn Appellant's car around in the driveway but that it would have required a three-point turn.

The trial court denied Appellant's motion to suppress during an April 30, 2007 hearing. The court held that no reasonable person in Appellant's position would have thought they would have to stop or that they were seized if a cruiser came up behind them without its blue lights flashing. More specifically, the court ruled that no reasonable person would have thought they were seized if a cruiser approached with just its white lights activated. With respect to the particular facts of this case, the trial court ruled that Appellant was not seized when Deputy Mahaffey stopped and got out of the cruiser. It noted that Deputy Mahaffey did not prevent Appellant from leaving or do anything to indicate that Appellant was not free to leave. Instead, the court ruled that Deputy Mahaffey's stop was simply an exercise of his community caretaking function. Notably, the trial court specifically found that Deputy Mahaffey activated his rear amber lights, which were not visible to Appellant, and his white take-down lights but not his blue emergency lights. Consequently, the trial court denied Appellant's motion.

On July 29, 2008, Appellant asked the trial court to reconsider its suppression decision in light of the United States Supreme Court's opinion in Brendlin v. California, 127 S. Ct. 2400 (2007). The trial court denied the motion.

## B. Motions Regarding Breathalyzer Test Evidence

Appellant filed two motions relating to the State's use of the results of her breath alcohol test. The first, a motion in limine, sought to prohibit the State from introducing the results of the test. The second sought to compel the State to turn over the testing device's source code to the defense.

Regarding the motion in limine, Appellant argued that the State should be barred from introducing the results of the breathalyzer test unless it produced a witness to testify, essentially, to the reliability of the device and to whether the proper procedures were followed when the device was used to test Appellant's breath alcohol content. Appellant contended that the introduction of the results without such a witness would violate her constitutional rights to confrontation, citing Crawford v. Washington, 541 U.S. 36 (2004). In addition, she asserted that such testimony was necessary to ensure the reliability of the scientific evidence under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

In support of Appellant's discovery motion, she argued that the State should be required to produce the source code—the computer programing that instructs the breathalyzer

-4-

device—in order to allow her to properly evaluate the test results. Noting that other states—in particular, Minnesota and New Jersey—have granted discovery motions regarding breathalyzer devices, Appellant contended that production of the source code in this case "may provide exculpatory evidence and [is] necessary . . . to determine the scientific validity of the machines and testing processes."

Both motions were addressed at a June 23, 2008 hearing. However, Appellant's counsel limited the motion in limine, saying that the "Crawford motion" would be relevant

> [i]f [the State was] not going to call the [Tennessee Bureau of Investigation] technician about this matter . . . but we can go ahead and eliminate [t]his, since they indicate they were going to have him here, we can go ahead and test this and if the Court feels he's qualified, which I assume he will, then that will shorten that part of it in the trial.

Although the lines between the motions blurred, Appellant's counsel only tangentially mentioned the motion in limine, suggesting that the defense would question "whether [the TBI agent's testimony] will meet the Daubert test." Appellant did not elaborate on her position concerning the motion in limine. The record does not reflect that the issue was addressed again until this appeal.

The hearing focused on the testimony of one witness, TBI Special Agent Dave Ferguson. Agent Ferguson, a forensic scientist assigned to the Knoxville Regional Crime Lab, started with the TBI in 1997 and began working with breath alcohol analysis in 2000. He had been court-qualified in breath alcohol and blood alcohol analysis. Agent Ferguson testified that he had a bachelor's degree in chemistry from Tennessee Technological University and a master's degree in chemistry, with an emphasis in biochemistry, from Vanderbilt University.

Agent Ferguson testified that the TBI was responsible for maintaining the breathalyzer machines used by law enforcement throughout Tennessee and that he was the agent charged with maintaining the 72 to 74 devices in the eastern portion of the state. In particular, he was responsible for maintaining the specific device used to test Appellant's breath alcohol content in this case, the Intoximeter EC/IR-II ("Intoximeter"). Agent Ferguson tested these devices, including the Intoximeter, every three months by running known quantities of alcohol through the machines and calibrating them if necessary. In addition, the Intoximeter tested itself on a weekly basis. The device would not give a result if it was not working properly. Agent Ferguson explained that it would only print out a result if it was functioning properly.

The Intoximeter was manufactured by a company in St. Louis, Missouri. Agent Ferguson testified that he attended a training seminar in St. Louis put on by the manufacturer. He also testified that the manufacturer did not give the State the source code for the device, which he testified was "proprietary." Noting that he did not feel qualified to testify in detail about the source code, Agent Ferguson testified that he did not know if the source code for the Intoximeter was generally accepted in the scientific community nor did he know if the source code had been given appropriate scrutiny. Nevertheless, Agent Ferguson testified that the Intoximeter met the TBI protocols and standards.

Agent Ferguson testified that the State evaluated several breathalyzer devices in 2003 and ultimately chose the Intoximeter. He explained that the State supplied its standards to different manufacturers and asked them to provide devices for the State to evaluate. Agent Ferguson was among those who tested the various machines during the evaluation period. During the State's evaluation, it tested the devices against known quantities of alcohol. It also compared the devices' results against simultaneously extracted blood samples. Ultimately, the State selected the Intoximeter, which it began using in 2005.

Agent Ferguson was responsible for maintaining the particular device that tested Appellant's breath. The last time Agent Ferguson tested the machine prior to Appellant's March 2006 arrest was on January 5, 2006. He ran a known quantity of alcohol, .08 percent, through the machine and the machine registered a reading of .079; the machine did not need calibration. Following Appellant's arrest, Agent Ferguson next tested the device on April 5, 2006. Again, the device did not need calibration; the test resulted in a reading of .078. Agent Ferguson also testified that the only time this particular device failed a self-test was in January 2008 and that the device was later fixed.

Agent Ferguson testified that the Intoximeter has a margin of error of plus or minus .005 percent and that the printed result rounds down to the nearest one-hundredth. In other words, if the device concludes that a sample contains .079 percent alcohol, the printed report will read .07. However, because the device has a .005 percent margin of error, a .07 reading indicates that the sample's actual alcohol content could be as low as .065 or as high as .084.

At the conclusion of Agent Ferguson's testimony, Appellant argued that Tennessee Rule of Criminal Procedure 16 permitted Appellant to demand discovery of the source code. To the extent the State did not have the source code in its possession, Appellant's counsel told the court that she would subpoena it from the manufacturer.

The trial court issued a written order denying Appellant's discovery motion on September 10, 2008. Although it noted that other courts have expressed concerns about breath alcohol testing devices, citing State v. Chun, 943 A.2d 114 (N.J. 2008), it nevertheless

denied Appellant's motion. The trial court noted that there was no Tennessee appellate court case holding that the source code was discoverable and that the Tennessee Supreme Court's decision in State v. Sensing, 843 S.W.2d 412 (Tenn. 1992), concluded that a previous model device made by the same manufacturer was accurate; and that the evidence revealed studies that determined the accuracy of the particular device at issue in this case. While the trial court withheld judgment as to the admissibility of the test under Sensing, it denied Appellant's source code discovery motion.

Appellant returned to the source code discovery motion at a hearing just prior to trial on September 15, 2008.[2] Appellant pointed to an August 20, 2003 TBI memorandum regarding the TBI's minimum standards for evaluation of breath alcohol testing devices. The memorandum, which was signed by Mark Gwyn, the then-Assistant Director of the Forensic Services Division of the TBI, provided that the "source code shall be furnished in order that questions, additions, deletions, or copies, etc. can be changed." Appellant argued that this memorandum contradicted Agent Ferguson's testimony that the State did not possess the source code. The trial court reaffirmed its prior denial of Appellant's source code discovery motion, noting that, even if the TBI possessed the source code, the evidence concerning the testing and accuracy of the Intoximeter generally, and the particular device used to test Appellant, justified the court's ruling.

### C. Bench Trial

Appellant's bench trial took place on September 15, 2008. At the beginning of the trial, the parties agreed that the evidenced adduced at the prior hearings would be considered by the trial court. The State then recalled Deputies Mahaffey and Roistacher.

Deputy Mahaffey again testified about the events leading to Appellant's arrest. He testified that his first contact with Appellant came at around 11:21 p.m. on March 24, 2006. Deputy Mahaffey stopped to check on Appellant, who had pulled off the highway. When he approached Appellant's car, he immediately noticed a "strong" odor of alcohol. Deputy Mahaffey asked if Appellant was okay, to which she responded that she was too drunk to drive. Deputy Mahaffey recalled that Appellant had slurred speech and that she was unsteady exiting her vehicle. She did not, however, fumble with her ID when she presented it to Deputy Mahaffey, and he did not see any alcohol in her car.

Deputy Mahaffey requested Appellant participate in certain field tests to determine if she was intoxicated. He asked her to perform the horizontal gaze nystagmus, the "one-

---

[2] It is unclear whether Appellant actually filed a motion for reconsideration. Our review of the record revealed no such motion. However, the trial court entertained Appellant's argument.

legged stand," and the "walk and turn." With respect to the one-legged stand, Appellant demonstrated two of the four "validated clues" suggesting intoxication: she swayed and she dropped her foot before being asked. Deputy Mahaffey noted that Appellant had been jovial during the instruction portion of the walk and turn test, but her demeanor changed when he asked her to perform it. Appellant lost her balance and started to perform the test too soon. She then refused to participate and asked for a cigarette. At that point, Deputy Mahaffey decided Appellant was intoxicated.

Deputy Mahaffey subsequently transported Appellant to the police station. Along the way, he stopped his cruiser twice so Appellant could vomit on the side of the road. In addition, Appellant, at her husband's request, refused to sign a Tennessee informed consent form, which Deputy Mahaffey read to her twice.

Deputy Mahaffey testified that he conducted a breath alcohol test on Appellant using the Intoximeter. He explained that he followed TBI procedures for conducting the test. He first tested the device, which he said was working properly, and he observed Appellant for 23 to 24 minutes. The test reported that Appellant's blood alcohol content was .20 percent. The State admitted the results into evidence without objection from Appellant.

Deputy Roistacher testified that he was in the cruiser while Deputy Mahaffey was talking with Appellant. He also testified, in contrast to his previous testimony, that he overheard Appellant tell Deputy Mahaffey that she did not need to perform any field sobriety tests, that she had been at a bar and had too much to drink, and that she had already called for a ride home. Deputy Roistacher again testified that neither he nor Deputy Mahaffey activated their car's blue lights. He also recalled that approximately five to ten minutes after they stopped behind Appellant, a second patrol cruiser arrived with its blue lights activated.

Deputy Roistacher also testified that after Deputy Mahaffey placed Appellant under arrest, they stopped twice on the way to the jail so Appellant could vomit. In addition, Appellant had urinated on herself by the time they arrived at the jail. In Deputy Roistacher's opinion, Appellant was too impaired to drive.

Appellant also testified. She explained that she pulled into the one-way driveway and could not get into the recycling center's exit driveway because the gate was shut and locked. She admitted that there was enough room for another car to pass Deputy Mahaffey's cruiser if she had wanted to leave. Appellant also admitted that she pulled into the driveway because she believed she was too impaired to drive and that she vomited twice on the way to the police station.

During closing arguments, the State contended that there was sufficient evidence to prove beyond a reasonable doubt that Appellant was driving under the influence of an intoxicant. It also argued that there was sufficient evidence to find that her blood alcohol content was .20 percent, making her eligible for an enhanced punishment.

Appellant's counsel did not contest that, presuming the trial court credited all of the evidence before it, there was sufficient evidence to find Appellant guilty. In particular, the pertinent portion of Appellant's counsel's argument is as follows:

> I'm not going to argue that under the facts and the circumstances the tri[e]r of fact could find her guilty, my argument is, I've got two things. Of course, the Court knows I'm primarily relying upon the motion to suppress and the stop. The second thing . . . is I think that the burden is upon the proof to show—and I do not believe a .20, with the testimony of Mr. Ferguson with a plus or minus of five percent, I think that has not been proved beyond a reasonable doubt. I think from what he's testified, he—no one testified that that was infallible. In fact, in the hearing on the 23rd of June . . . he candidly stated that we have an error tolerance of .05.
> Now, if [Appellant] had blown a .21, . . . I wouldn't be making this argument. But a .20, if it is one hundred percent accurate, and the State does not claim it to be a hundred percent accurate . . . puts it under a .20. So I think . . . as far as punishment, that if you find her guilty, you find her guilty of between point .08 and .20. That's what the proof is . . . and I think the burden is upon the State to prove beyond a reasonable doubt, which they have not done.
> The rest of my argument . . . I'd merely adopt the previously . . . I'd merely ask that all the exhibits be put into evidence and if we decide to go further, we will.

The trial court found Appellant guilty of DUI beyond a reasonable doubt. It further found that Appellant's blood alcohol content was .20 under count two, thereby exposing her to enhanced punishment. The trial court sentenced Appellant to 11 months and 29 days to be served in a workhouse and suspended all but seven days of the sentence.

This appeal followed.

## II. Analysis

Appellant raises four issues in this appeal. She first claims that the trial court erred in denying her motion to suppress, arguing that Deputy Mahaffey's stop violated Appellant's

constitutional rights against unreasonable searches and seizures. She next claims that the trial court erred in denying her source code discovery motion. As part of that argument, she also revives her arguments from the motion in limine. Third, Appellant contends the evidence was insufficient to convict her on count two, the count alleging Appellant's blood alcohol content was above .20 percent. Finally, she contends the trial court erred in ordering an enhanced sentence based on the .20 percent breathalyzer test. We address each argument in turn.

## A. Motion to Suppress

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23.

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution protect citizens against unreasonable searches and seizures. Our supreme court has previously noted that, generally, "[A]rticle I, section 7 is identical in intent and purpose with the Fourth Amendment." State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (citation and quotation marks omitted). "However, neither the Fourth Amendment nor Article I, section 7 limit all contact between police and citizens." State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000). The United States Supreme Court has long recognized that police officers may engage citizens in encounters unrelated to the detection and investigation of criminal conduct. See Cady v. Dombrowski, 413 U.S. 433, 441 (1973). In doing so, officers operate in their so-called "community caretaking" capacity. Id. The constitutional protections against unreasonable searches and seizures "are implicated only when a police officer's interaction with a citizen impermissibly intrudes upon the privacy or personal security of the citizen." Daniel, 12 S.W.3d at 424. Our courts have thus articulated three categories of police-citizen interaction and their corresponding evidentiary requirements: "(1) full-scale arrest, which must be supported by probable cause; (2) brief investigatory detention, which must be supported by reasonable suspicion of criminal activity; and (3) brief police-citizen encounter that requires no objective justification." State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009) (citations omitted); see also State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006).

The third category of police-citizen interactions "includes community caretaking or public safety functions." State v. Williams, 185 S.W.3d 311, 315 (Tenn. 2006). This category of "[v]oluntary or 'consensual' encounters between police and citizens are not considered seizures and are not protected by the United States or Tennessee Constitutions." Id. As a result, "[g]enerally, an officer may approach an individual in a public place and ask questions without implicating constitutional protections, so long as a reasonable person would feel free to disregard the police and go about his business." Id. (quotation marks and brackets omitted). More particularly, our supreme court has held that "a police officer may approach a car parked in a public place and ask for driver identification and proof of vehicle registration[] without any reasonable suspicion of illegal activity." Id. (quoting State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993)) (quotation marks and brackets omitted).

The community caretaking interaction crosses the line and becomes a seizure, however, "when an officer by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Id. at 316 (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)) (quotation marks omitted). As the United States Supreme Court has articulated it, "a seizure occurs 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" Id. (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). A seizure without a warrant is presumed unreasonable, and evidence derived therefrom subject to suppression, under both the federal and state constitutions "unless the State demonstrates that the seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." Nicholson, 188 S.W.3d at 656. Because Appellant was eventually arrested without a warrant, the critical questions in this appeal are (1) *when* was Appellant seized, *i.e.*, when did Officer Mahaffey stop acting in his community caretaking capacity; and (2) whether that seizure fell within one of the narrow exceptions to the warrant requirement.

Our analysis of the first question revolves around the familiar "reasonable person" standard for defining a seizure. See, e.g., Florida v. Bostick, 501 U.S. 429, 434-39 (1991); Williams, 185 S.W.3d at 315-17; Daniel, 12 S.W.3d at 425-26. In Bostick, the United States Supreme Court held that

> in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

501 U.S. at 439. Likewise, under the Tennessee Constitution a seizure occurs only if all of the circumstances surrounding the encounter would cause a reasonable person to believe she

"was not free to leave." Nicholson, 188 S.W.3d at 657. Our supreme court has provided the following list of factors to consider in conducting the analysis:

> 1) the time, place and purpose of the encounter; 2) the words used by the officer; 3) the officer's tone of voice and general demeanor; 4) the officer's statements to others who were present during the encounter; 5) the threatening presence of several officers; 6) the display of a weapon by an officer; and 7) the physical touching of the person of the citizen.

Id. (citing Daniel, 12 S.W.3d at 425-26). "This analysis is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." Id. (quotation marks omitted). But an encounter typically becomes a seizure

> if an officer: (1) pursues an individual who has attempted to terminate the contact by departing; (2) continues to interrogate a person who has clearly expressed a desire not to cooperate; (3) renews interrogation of a person who has earlier responded fully to police inquiries; (4) verbally orders a citizen to stop and answer questions; (5) retains a citizen's identification or other property; (6) physically restrains a citizen or blocks the citizen's path; [or] (7) displays a weapon during the encounter.

Id. (quoting Daniel, 12 S.W.3d at 426). Moreover, "[w]hile most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." Daniel, 12 S.W.3d at 425 (quotation marks omitted). Indeed, under the reasonable person analysis, "police-citizen encounters do not become 'seizures' simply because citizens may feel an inherent social pressure to cooperate with police." Id.

The record in this case supports the trial court's conclusion that Deputy Mahaffey was acting in his community caretaking capacity when he stopped to check on Appellant. Deputy Mahaffey testified that he stopped because he was concerned that Appellant might be in distress; he did not suspect her of a crime. The evidence supports the trial court's finding that Deputy Mahaffey parked his cruiser such that Appellant could leave if she desired. It also supports the finding that the blue lights on Deputy Mahaffey's cruiser were not activated, only its rear amber lights, which were not visible to Appellant. Furthermore, the evidence indicates that Deputy Mahaffey's other conduct did not demonstrate that he was exercising authority over Appellant. He waited until she finished dialing the number into her telephone before speaking to her. There is no evidence that his language or tone were authoritative. Moreover, his initial question—whether everything was okay—indicates that

-12-

he was operating in his community caretaking function, not investigating a possible crime. In short, nothing in this record suggests that Deputy Mahaffey was operating outside the bounds of his community caretaking capacity, and nothing indicates that a reasonable person in Appellant's position would believe they were not free to leave, other than the general obligation many citizens feel to respond to law enforcement questions, see Daniel, 12 S.W.3d at 425.

Appellant argues that no reasonable person would have felt free to leave, and, in fact she herself did not feel free to leave, because Deputy Mahaffey's vehicle pulled up behind her, partially blocked her exit from the driveway, and activated its white takedown lights. She also points out that there is some dispute in the record concerning whether only the takedown lights were activated or whether the blue emergency lights were also on. There is also a dispute about whether Appellant could have seen the cruiser's rear amber lights, which were also activated. However, the trial court found that the blue lights were not on and that Appellant could not have seen the amber lights. As noted above, the record supports the trial court's findings of fact, and we will not second-guess it on appeal. See Odom, 928 S.W.2d at 23.

While Deputy Mahaffey was initially acting in his community caretaking capacity, once he asked Appellant to step out of the car to conduct the field sobriety tests he seized Appellant in a constitutional sense. He did so without a warrant, but the detention fell into the second of the three constitutionally-permissible categories: it was a "brief investigatory detention" and was "supported by reasonable suspicion of criminal activity." Hanning, 296 S.W.3d at 48. Reasonable suspicion "is determined by considering the totality of the circumstances surrounding the stop." State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000); see also State v. Day, 263 S.W.3d 891, 902-03 (Tenn. 2008) (noting that "an officer making an investigatory stop must be able to articulate something more than an inchoate and unparticularized suspicion or hunch" and that there must be "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an intrusion upon the suspect (quotation marks omitted)). We have no difficulty concluding Deputy Mahaffey had a reasonable suspicion that Appellant had violated Tennessee Code Annotated section 55-10-401. Deputy Mahaffey testified that when his conversation with Appellant began, he noticed a "strong" odor of alcohol emanating from her car. In addition, in response to his question of whether she was okay, Appellant said she was "too drunk to drive." Deputy Mahaffey, having just seen Appellant operating her vehicle on the highway, thus had a particularized and objective basis for suspecting Appellant had violated section 55-10-401. Consequently, he did not need a warrant to conduct his brief investigatory detention.

Deputy Mahaffey's warrantless arrest likewise did not run afoul of Appellant's constitutional protections. In order to arrest Appellant, Deputy Mahaffey had to have probable cause that she had committed a crime. See Hanning, 296 S.W.3d at 48. Probable cause "means more than bare suspicion" and "exists where the facts and circumstances within . . . the officer['s] knowledge, and of which [he] had reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Day, 263 S.W.3d at 902 (quotation marks and brackets omitted). Here, the facts and circumstances easily pass that threshold. As noted above, Deputy Mahaffey noticed an odor of alcohol emanating from Appellant's car, and Appellant herself admitted to being "too drunk to drive." In addition, she swayed and dropped her foot during the one-legged stand and revealed two validating clues during the instruction portion of the walk and turn test: she lost her balance and tried to start the test too soon. Further, Appellant refused to attempt the walk and turn. At that point, Deputy Mahaffey had a sufficient factual basis to believe Appellant had committed an offense. Consequently, the warrantless arrest did not violate Appellant's constitutional protections, and the trial court did not err in denying Appellant's motion to suppress.

### B. Appellant's Source Code Motions

Appellant next contends the trial court erred in admitting the results of her breath test. Her argument takes two forms: (1) that the trial court erred in denying her motion in limine to restrict the use of the use of the test results absent certain showings by the State and (2) that the trial court erred in denying her discovery requests seeking to obtain the "source code" for the Intoximeter. We will address the motion in limine first.

### 1. Background regarding breath alcohol test source codes

We have previously noted that, while Tennessee law forbids motorists from driving "[u]nder the influence" of intoxicants, see Tenn. Code Ann. § 55-10-401(a), "[t]he degree to which an individual is 'under the influence' of an intoxicant is determined by the amount of the intoxicant in the brain," State v. Johnson, 717 S.W.2d 298, 300 (Tenn. Crim. App. 1986).

Rather than directly measuring the amount of alcohol in the brain, police use "samples of other biological materials" to estimate that amount. Id. Those biological materials are typically samples of the motorist's blood or breath. With respect to breath tests, we noted in Johnson that

> [t]he testing of breath for alcohol content of the blood is derived
> from the fact that blood and breath "meet" at the alveoli in the

lungs. Oxygen is imparted from the breath to the blood in exchange for wastes which are imparted from the blood to the breath. Since it is impossible to actually go down into the lungs for testing, scientific principles must be applied in order to accomplish the testing. The principle applied to this process is Henry's Law.

This law of physics, observed and first described by William Henry in 1803, recognizes that the concentration of a volatile substance dissolved in a liquid is directly proportional to the vapor pressure of the volatile substance above the liquid.

As applied to blood alcohol testing, it is believed that the concentration of alcohol in the blood is directly proportional to its concentration in the deep lung air of the person being tested. The trick is how to formulate the proper ratio of alcohol found in the breath to the alcohol found in the blood. This has been the focus of disagreement in the scientific community, but the generally accepted ratio is 2100:1. Whatever the concentration of alcohol may be in the blood, the concentration of alcohol in the person's deep lung air is 1/2100th as much. To compute the blood alcohol content, it is necessary to obtain a sample of deep lung air of known volume, determine the amount of alcohol in the breath sample and then mathematically convert that quantity to a percentage of blood alcohol, using the 2100:1 ratio.

Id. at 300-01; see also Chun, 943 A.2d at 126-27 (providing a thorough discussion of the physiology behind breath alcohol testing).

In conducting its analysis, breath alcohol testing devices follow what are referred to as "source codes." The source code is the computer programing technology that controls the operation of the testing machine, in this case the Intoximeter. As one court has put it, the source code is "the computer commands that control the [device] as it isolates the subject's breath sample, tests the sample for the presence and the amount of alcohol, and then uses the test results to calculate the subject's blood alcohol level." Commonwealth v. House, 295 S.W.3d 825, 827 (Ky. 2009). Put another way, "[s]ource codes are the computer instructions followed by a computing device in processing information." Hills v. State, 663 S.E.2d 265, 265 n.1 (Ga. Ct. App. 2008). Thus, the source code in a breath alcohol test device instructs the machine on how to analyze the breath sample and convert its analysis into a numeric representation of the resulting estimate of the percentage of alcohol in the blood stream.

-15-

## 2. Appellant's motion in limine

Generally, the admissibility of evidence lies within the sound discretion of the trial court, and an appellate court will not interfere with the lower court's exercise of that discretion absent a clear showing of abuse. State v. Carruthers, 35 S.W.3d 516, 574 (Tenn. 2000). The trial court's discretion in determining the admissibility of this evidence is generally circumscribed by the Tennessee Rules of Evidence. We review the trial court's denial of Appellant's motion in limine for abuse of discretion.

Since our decision in Johnson, Tennessee courts have reaffirmed their acceptance of the science behind breath alcohol testing and in particular the 2100:1 ratio. See, e.g., Sensing, 843 S.W.2d at 415-16. In Sensing, our supreme court expressly embraced breath testing and the then-modern scientific technology to conduct the tests, which it noted could make the ratio calculation with a very high degree of accuracy. Id. at 416. The court noted "that the technique of testing breath samples for blood alcohol content has achieved general acceptance in the scientific community." Id. at 417. The court similarly noted that "[t]hese machines are subjected to exhaustive testings to assure they meet required standards before use" and that "[c]onstant monitoring verifies their continued effectiveness." Id. at 416.

Because breath testing "instruments and procedures have become familiar and their use is now commonplace," Sensing relaxed "the rigorous prerequisites formerly required to authenticate the reliability of the scientific equipment and procedure." Id. It thus streamlined the admission of breath test results into evidence by requiring that the State only produce the testing officer to testify

> (1) that the tests were performed in accordance with the standards and operating procedure promulgated by the forensic services division of the [TBI], (2) that he was properly certified in accordance with those standards, (3) that the evidentiary breath testing instrument used was certified by the forensic services division, was tested regularly for accuracy and was working properly when the breath test was performed, (4) that the motorist was observed for the requisite 20 minutes prior to the test, and during this period, he did not have foreign matter in his mouth, did not consume any alcoholic beverage, smoke, or regurgitate, (5) evidence that he followed the prescribed operational procedure, [and] (6) identify the printout record offered in evidence as the result of the test given to the person tested.

Id.  In other words, "[t]he State must establish the competency of the operator, the proper operation of the machine and that the testing procedures are properly followed."  Id.  The court also articulated its criteria for admissibility as being that

> the admissible evidence must show (1) that an evidentiary breath tester test was performed substantially in accordance with instructions approved by the forensic services division, with a type of device certified by the forensic service division, by a person trained and certified to conduct it and, (2) that the machine itself had been tested, inspected and certified in accordance with forensic division regulations to assure its accuracy before the results of an evidentiary breath tester test may be introduced.

Id. at 418.  "Compliance with Sensing is a condition precedent to the admissibility of the breath test result."  State v. Brooks, 277 S.W.3d 407, 413 (Tenn. Crim. App. 2008) (quotation marks omitted).

Appellant tries to cast the issue as one concerning her constitutional rights to confrontation under Crawford, 541 U.S. 36, and the admissibility of the test results under Daubert, 509 U.S. 579.  Neither framing is accurate.  As the United States Supreme Court has recently explained, the Confrontation Clause "guarantees a defendant's right to confront those who bear testimony against him."  Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527, 2531 (2009) (quotation marks omitted). Crawford holds that "[a] *witness's* testimony against a defendant is . . . inadmissible unless the *witness* appears at trial or, if the *witness* is unavailable, the defendant had a prior opportunity for cross-examination."  Id. (emphasis added).  In this case, the Intoximeter simply produced a print-out of its results.  Neither that print-out nor the Intoximeter is a "witness" within the meaning of the Confrontation Clause.  In contrast, the report at issue in Melendez-Diaz was an affidavit prepared by the technician who performed an analysis of the substance at issue in that case.  Id. at 2532.  This case thus does not pose a Confrontation Clause issue.

It likewise does not pose a Daubert issue.  Daubert concerns the standard for admitting expert testimony under Federal Rule of Evidence 702.  509 U.S. at 589-90.  Our supreme court has held that after the Sensing prerequisites have been met, the test results are admissible and the trial court does not have to determine whether the results "will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." State v. Edison, 9 S.W.3d 75, 76-77 (Tenn. 1999) (quotation marks omitted); accord State v. Deloit, 964 S.W.2d 909, 914-15 (Tenn. Crim. App. 1997) (noting that the State can introduce the results of a breath alcohol test either by satisfying the requirements in Sensing or by satisfying Tennessee Rule of Evidence 702, our state's equivalent to Federal Rule of Evidence 702).

We conclude that the trial court did not abuse its discretion in admitting the results of Appellant's breath alcohol test in this case. Between the testimony of Agent Ferguson and Deputy Mahaffey, there is no question—nor does Appellant dispute—that the State provided sufficient evidence to satisfy Sensing. That does not mean, however, that the results cannot be challenged. We therefore turn to the question of whether Appellant was entitled to the source code to mount such a challenge.

### 3. Appellant's motion for production of the source code

Despite our supreme court's strong endorsement of the science and technology behind breath alcohol testing, Sensing leaves the door open for DUI defendants to challenge damaging breath test results. Sensing expressly declined to hold "that test results are infallible or conclusive." 843 S.W.2d at 418. It also held that after the admission of a breath test result, "[t]he defense is then free to rebut the State's evidence by calling witnesses to *challenge the accuracy of the particular machine*, the qualifications of the operator, and the degree to which established testing procedures were followed." Id. at 416 (emphasis added).

Appellant's motion for production of the source code concerns the scope of a defendant's ability to challenge the accuracy of a breath alcohol test's results. More specifically, it addresses a defendant's ability to challenge "the manner in which the [Intoximeter] performs [its] function" of converting "breath alcohol content to blood alcohol content." Id. Our supreme court has already explained that "[e]xpert testimony and the records of [the device's] procedures are available for examination." Id. It has also informed us that "[t]he trial court is in a position to control the introduction of such evidence in order to avoid delay in the disposition of cases of this nature." Id. Thus, the question posed by this appeal is one of the availability of discovery and the extent to which a defendant who has taken a breath alcohol test can demand access to the underlying computer technology that operated the testing device.

It is important to recall Sensing's admonition that breath tests are not "infallible." Id. at 418. Breath test results are simply numeric representations of the devices' estimation of the amount of alcohol in the blood. See Chun, 943 A.2d at 126 (noting that breathalyzers "test breath samples and convert that analysis by mathematical calculations to an expression of the subject's *presumed* blood alcohol content" (emphasis added)). Because that is the case, the set of instructions the computer follows to collect and analyze a particular breath sample—the source code—is important.

The New Jersey Supreme Court's discussion of source codes provides a sampling of the types of issues that can arise when a source code contains errors, albeit for a different device than the one used in this case. See id. at 153-60. Such issues can include inadequate

accounting for aging fuel cells or imperfections in the way the source code instructs the device to weigh and average the multiple measurements it takes. See id. at 154-57.

The question of whether a DUI defendant is entitled to the source code appears to be one of first impression in our state.[3] Appellant contends the source code was discoverable under Tennessee Rule of Criminal Procedure 16. That rule provides, in pertinent part:

> Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the state's possession, custody, or control, and:
>
> (i)     the item is material to preparing the defense;
> (ii)    the government intends to use the item in its case-in-chief at trial; or
> (iii)   the item was obtained from or belongs to the defendant.

Tenn. R. Crim. P. 16(1)(F). Plainly, the Rule requires the document or object be in a certain form (a book, document, etc.). It also requires the State have "possession, custody, or control" of the item. See State v. Hutchinson, 898 S.W.2d 161, 168 (Tenn. 1994) (quotation marks omitted); see also State v. Matthew Carfi, No. M2005-01467-CCA-R3-CD, 2006 WL 2788523, at *29-30 (Tenn. Crim. App. at Nashville, Sept. 29, 2006). Finally, the Rule requires the movant demonstrate that the item meets one of the three criteria listed in subsections (i)-(iii).

We see no error in the trial court's conclusion that the source code was not discoverable under this Rule. First, Appellant has failed to demonstrate that the State had possession, custody, or control over the source code. Appellant relies upon the August 20, 2003 TBI memorandum that lists the "minimum standards and specifications" for evaluating

---

[3] The question has, however, been addressed in several other jurisdictions. For instance, Minnesota cases hold that a DUI defendant *may* be entitled to obtain the source code for the breath-testing device currently used in that state. See, e.g., In re Comm'r of Public Safety, 735 N.W.2d 706, 712-13 (Minn. 2007). However, the majority of the states we have examined that have passed on similar cases have held that DUI defendants are not entitled to pre-trial discovery of the devices' source codes, at least on the records in those cases. See, e.g., House, 295 S.W.3d 825; State v. Bastos, 985 So.2d 37 (Fla. Dist. Ct. App. 2008); People v. Robinson, 860 N.Y.S.2d 159 (N.Y. App. Div. 2008); Hills, 663 S.E.2d 265; City of Fargo v. Levine, 747 N.W.2d 130 (N.D. 2008); State v. Michael Burnell, No. MV06479034S, 2007 WL 241230, at *2 (Conn. Super. Ct. Jan. 18, 2007); Moe v. State, 944 So.2d 1096 (Fla. Dist. Ct. App. 2006). But see State v. Smiley, 689 S.E.2d 94 (Ga. Ct. App. 2009) (affirming a trial court's suppression of test results for, among other things, failing to turn over the testing device's source code).

breath alcohol instruments as evidence that the State actually possessed the source code.[4] The document contains the following paragraph: "20. Program Editing – The controller source code shall be furnished in order that questions, additions, deletions, or copies, etc. can be changed." However, the document concerns a different device, and we see no other evidence in the record indicating that the State has possession, custody, or control over the Intoximeter source code. On the other hand, Agent Ferguson testified that the TBI never acquired the source code for the Intoximeter. The trial court credited Agent Ferguson's testimony over the memorandum. Because there is evidence in the record to support the trial court's findings and because we do not weigh the evidence in reviewing such a decision, we accept the trial court's findings. Thus, Appellant has failed to demonstrate that the State had the source code in its possession, custody, or control, and the trial court did not err in denying Appellant's discovery request.[5]

Second, Appellant has not satisfied subsections (1)(F)(i), (ii), or (iii). The only one of those criteria that is possibly at play here is subsection (i), which requires that the item sought be "material to preparing the defense." To do so, Appellant "must do more than emphatically state that [she] needed certain discovery. [She] must show how the discoverable items were material to the preparation of [her] defense." State v. Thomas Dee Huskey, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *60 (Tenn. Crim. App. at Knoxville, June 28, 2002); see also Carfi, No. M2005-01467-CCA-R3-CD, 2006 WL 2788523, at *27-28; Jason Blake Bryant v. State, No. E2002-00907-CCA-R3-PC, 2004 WL 443414, at *18 (Tenn. Crim. App. at Knoxville, Mar. 11, 2004). This court has previously upheld a trial court's denial of a Rule 16 discovery request for documents related to a blood alcohol test when the defendant has failed to demonstrate the materiality of the requested items. See Davis, No. M2000-00737-CCA-R3-CD, 2000 WL 1879518, at *5. There, as here, the defendant "failed to make an offer of proof regarding the materiality of

---

[4] The document was an exhibit during the June 23, 2008 motion hearing.

[5] We are not alone in declining to compel the production of source codes because the defendant failed to demonstrate that the code as in the possession, custody, or control of the state. See, e.g., Hills, 663 S.E.2d at 873; Levine, 747 N.W.2d at 134; Burnell, No. MV06479034S, 2007 WL 241230, at *2; Moe, 944 So.2d at 1097. Not surprisingly, none of these cases apply Tennessee's criminal discovery rules. But some of them apply rules that, like Tennessee's Rule 16, are descendants of Federal Rule of Criminal Procedure 16, and are therefore at least somewhat illuminating.

Our conclusion on this issue does not mean that Appellant could not have attempted to subpoena the source code directly from the Intoximeter manufacturer under Rule 17. See State v. Zane Allen Davis, Jr., No. M2000-00737-CCA-R3-CD, 2000 WL 1879518, at *6-7 (Tenn. Crim. App. at Nashville, Dec. 28, 2000) (noting that Rule 17 may be available when the lack of evidence demonstrating that the State possesses the requested material prevents utilization of Rule 16). Appellant indicated at the motion hearing on this matter that she would go that route. It appears she did not.

the documents requested." Id. In the breathalyzer source code context, other states have also required a movant to make some showing of materiality. See, e.g., Bastos, 985 So.2d at 43 (concluding that the court "cannot accept the proposition that simply because a piece of testing equipment is used in a criminal case, it follows that the source code for its computer must be turned over" but instead holding that "[t]here would need to be a particularized showing demonstrating that observed discrepancies in the operation of the machine necessitate access to the source code"); Robinson, 860 N.Y.S.2d at 166 (noting that although a source code may be discoverable, absent a factual basis for suspecting the source code might contain "glitches" causing inaccuracies, the attempt to obtain the source code "constitutes nothing more than a fishing expedition"). But where, as here, the movant simply hopes that a later expert evaluation might reveal some flaw in the source code, the subpoena is "nothing but a classic fishing expedition." House, 295 S.W.3d at 829.

The record is devoid of any evidence indicating the source code would have been "material" to preparing Appellant's defense. There is no evidence of known—or even potential—problems with this source code. Nor is there any evidence suggesting that the source code would cause the device to function improperly with respect to Appellant. Furthermore, unlike the record the New Jersey Supreme Court faced in Chun, 943 A.2d at 126-27, Appellant has not produced even general evidence of problems that can be created by a faulty source code. We do not mean to suggest that evidence on any of these points would be sufficient to satisfy Rule 16(1)(F)(i), or that these are the only ways to satisfy the rule. Satisfaction of Rule 16 is still a question for trial courts to decide, in their discretion, on a case-by-case basis. Such evidence is missing from this record, and that silence is certainly not enough to satisfy Rule 16(1)(F)(i).

Appellant's reliance on the Minnesota line of cases as support for her discovery request is misplaced. The issue is controlled in Minnesota by two related supreme court decisions: In re Commissioner of Public Safety, 735 N.W.2d 706 (Minn. 2007) ("Underdahl I") and State v. Underdahl, 767 N.W.2d 677 (Minn. 2009) ("Underdahl II"). In Underdahl I, the court considered the state's appeal of a lower court order that it produce the source code for a device called the Intoxilyzer 5000EN. 735 N.W.2d at 708. Because of the procedural posture in that case, it was the *state's* burden to demonstrate that the source code was "clearly not discoverable," which it did not do. Id. at 712. Critical to the outcome in Underdahl I, the Intoxilyzer 5000EN was acquired by Minnesota in response to a request for proposal. Id. at 708-09. Given the particular RFP involved, the court viewed the particular Intoxilyzer 5000EN device to be "the Minnesota model." Id. at 708. More significantly, the RFP specifically stated that Minnesota would acquire "ownership of any and all copyrights in the copyrightable material." Id. Consequently, the court in Underdahl I, concluded that "it is not clear to us that the commissioner is unable to comply with the district court's order" and upheld the lower court's order to produce the source code. Id. at 713.

In Underdahl II, the court returned to the issue of a DUI defendant's right to compel discovery of the source code for the Minnesota model of the Intoxilyzer 5000EN. 767 N.W.2d 677. This time, the court consolidated two appeals in which the defendants sought discovery of the source code. Id. at 679-81. However, the records for the two cases provided vastly different evidentiary bases for their motions. In one, the movant's discovery motion "requested a copy of the [device's] source code . . . [but] contained no other information or supporting exhibits related to the source code." Id. at 685. He "made no threshold evidentiary showing whatsoever" and "failed to demonstrate how the source code would help him" dispute the charges against him. Id. He thus "advanced no theories on how the source code could be related to his defense or why the source code was reasonably likely to contain information related to his case." Id. (brackets omitted). In contrast, the other movant

> submitted source code definitions, written testimony of a computer science professor that explained issues surrounding the source codes and their disclosure, and an example of a breath-test machine analysis and its potential defects. [The movant's] submissions show[ed] that an analysis of the source code may reveal deficiencies that could challenge the reliability of the [device] and, in turn, would relate to [his] guilt or innocence.

Id. at 686. Not surprisingly, the court held that the first movant failed to meet his burden in requesting the source code, "even under a lenient showing requirement," whereas the trial court for the second movant "did not abuse its discretion in concluding that the source code may relate to his guilt or innocence." Id.[6]

In the present case, the record does not indicate that we are dealing with a device that was specifically commissioned by the State of Tennessee, and it certainly does not indicate that Tennessee acquired ownership of the copyrights to all copyrightable material in the device. In other words, we are not dealing with the "Tennessee model" of the Intoximeter. Thus, the Minnesota line of cases is not applicable to the issue of whether the state has possession, custody, or control over the source code. Accord Levine, 747 N.W.2d at 134. Moreover, like the first movant in Underdahl II, Appellant did not create a sufficient factual basis in the record to indicate that the source code would have become material to the preparation of her defense. There is no expert testimony regarding how the source code for

---

[6] In so holding, the court specifically reaffirmed its holding in Underdahl I that the state had possession of the source code, id. at 686-87, but it confined Underdahl I, to the "narrow question" of "whether the State had possession of the source code, not whether the defendant had established that the source code could be related to his defense or why the source code was reasonably likely to contain information related to the case," id. at 685 n.5.

the Intoximeter may have been inadequate nor is there any other evidence to suggest that the Intoximeter test was otherwise flawed.

In sum, the trial court did not abuse its discretion in denying either of Appellant's motions. The motion in limine fails because the State provided sufficient evidence to meet the supreme court's requirements for introduction of breathalyzer test results outlined in Sensing. The motion for production of the source code under Rule 16(1)(F) fails because Appellant failed to demonstrate that the State had possession, control, or custody over the source code and that the source code was material to her defense.

## C. Sufficiency of the Evidence

Appellant next challenges the sufficiency of the evidence supporting her conviction on count two. Appellant claims that, because the uncontroverted evidence in the case is that the breath test result was precisely .20%, and the Intoximeter has a margin of error of .005%, there is no way to conclude beyond a reasonable doubt that her blood alcohol content was actually at or above .20%. While there is logic to Appellant's argument, it overlooks the fact that the substantive statute under which she was convicted does not require a blood alcohol content at or above .20%. See Tenn. Code Ann. § 55-10-401(a). Rather, it requires proof that the Appellant be "[u]nder the influence of any intoxicant" or that the Appellant's blood or breath alcohol concentration be .08% or more. Tenn. Code Ann. § 55-10-401(a)(1)-(2). Assuming the Intoximeter result was the only evidence (which it was not), at the full margin of error, Appellant's blood alcohol content (.195%) would still be well above the minimum required in subsection (a)(2), .08%. Moreover, even absent the Intoximeter result entirely, there was sufficient evidence in the record from Deputies Mahaffey and Roistacher that Appellant violated subsection (a)(1). Thus, there was more than sufficient evidence to support Appellant's conviction.

## D. Sentencing

Appellant's last assignment of error is that the trial court erroneously relied upon the results of the Intoximeter test in arriving at her sentence. The sentencing statute for DUI offenses provides, in pertinent part, that first-time offenders who have a blood alcohol content at the time of the offense of .20% or more be subjected to an elevated "minimum period of confinement" of seven days. Tenn. Code Ann. § 55-10-403(a)(1)(A)(ii). The statute is careful to note that the increased minimum "constitutes an enhanced sentence, not a new offense." Tenn. Code Ann. § 55-10-403(a)(1)(A)(iii). That is significant because ordinarily the standard of proof to apply an enhancement is that of a preponderance of the evidence—not the beyond a reasonable doubt standard necessary for conviction. See State

v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000). Because that is the case, when this court has previously analyzed this precise issue, it has held

> that a .20% breathalyzer result, from a properly administered test, regardless of any margin of error, would be probative of the issue of blood alcohol content and admissible for sentencing purposes. . . . Because facts relevant to sentencing are required to be proved by only a preponderance of the evidence, and because the breathalyzer result suggests a probability of a blood alcohol content at or above the required minimum, the test results the state . . . offer[ed] as proof should not be excluded from consideration.

State v. Danny Munson, No. W2001-00151-CCA-R9-CD, 2001 WL 1768244, at *3 (Tenn. Crim. App. at Jackson, Dec. 31, 2001). We see no reason to revisit that conclusion. Therefore, we conclude that the trial court did not err in applying the enhancement to Appellant's sentence.

### III. Conclusion

After a thorough review of the record before us, we must affirm the trial court's judgment.

_____
NORMA McGEE OGLE, JUDGE

-24-